PEOPLE v PORTELLOS

Docket Nos. 301190 and 301333. Submitted November 6, 2012, at
    Detroit. Decided November 13, 2012, at 9:00 a.m.
    A Wayne Circuit Court jury convicted Emily Portellos of second-
    degree murder, MCL 750.317, and first-degree child abuse, MCL
    750.136b(2), for the death of her newborn child. Defendant, who
    was learning-disabled, gave birth at home without medical assis-
    tance, then wrapped the baby in a towel and placed it in a plastic
    bag next to her bed so her mother would not discover that she had
    been pregnant. Defendant's mother discovered defendant bleeding
    profusely and sent her by ambulance to the hospital, where a staff
    member notified the police about the birth. An investigating
    detective found the baby dead. The court, Daniel P. Ryan, J.,
    sentenced defendant to 86 to 180 months' imprisonment for the
    child abuse conviction and, in a downward departure from the
    recommended minimum sentence range under the sentencing
    guidelines, 10 to 20 years' imprisonment for the murder convic-
    tion. Defendant appealed her convictions in Docket No. 301190,
    and the prosecution appealed her sentence for the murder convic-
    tion in Docket No. 301333.

        The Court of Appeals *held*:

        1. Sufficient evidence supported defendant's convictions of
    first-degree child abuse and second-degree murder because a
    reasonable juror could find that defendant intentionally took
    actions that caused the baby's death or knowingly took those
    actions with a wanton disregard of the risks. The elements of
    second-degree murder are (1) a death, (2) caused by an act of the
    defendant, (3) with malice, and (4) without justification or excuse.
    Malice includes the intent to kill, the intent to cause great bodily
    harm, or the intent to take an action whose natural tendency is to
    cause death or great bodily harm, wantonly and willfully disre-
    garding that risk. A person is guilty of first-degree child abuse if
    the person knowingly or intentionally caused serious physical or
    serious mental harm to a child. A defendant must not only act, but
    must know that the act will cause serious physical harm. Viewing
    the evidence in the light most favorable to the prosecution, there
    was sufficient evidence to conclude that defendant knowingly or

intentionally harmed the baby. Defendant hid her pregnancy from her mother and told others that she was afraid that her mother would find out about it. Defendant was trained in first aid, CPR, and sudden infant death syndrome, had read books on labor and delivery, and decided to give birth at home unassisted. Defendant had a cellular phone, but did not call for assistance after determining that the baby was being born breech or after the baby did not cry or move upon being born, although she called her supervisor and coworkers to explain her absence from work. Defendant wrapped the baby tightly in a towel, then placed the baby in a garbage bag. On the basis of these facts, a reasonable juror could conclude that defendant had intentionally smothered the baby so that defendant's mother would not hear the baby cry; could alternatively conclude that the baby died because defendant failed to summon medical assistance, wrapped the baby tightly in a towel, or placed the baby in a garbage bag; and could reasonably infer that defendant knew that the natural and probable consequence of those actions included death or serious injury to the baby. Defendant's argument that her fear of her mother's response to her pregnancy negated the evidence of malice was unsupported by legal authority.

2. The trial court improperly assessed zero points for offense variable (OV) 3, MCL 777.33, which is scored when a victim was physically injured. Zero points are to be assessed if no physical injury occurred to a victim. Because the victim in this case was killed, the trial court was required to assess 25 points unless a higher score applied, which it did not.

3. The trial court did not clearly err by assessing zero points for OV 5, MCL 777.35, which is scored if serious psychological injury requiring professional treatment occurred to a victim's family. Neither the victim's father nor her grandmother, both of whom spoke at the sentencing hearing, expressed an intention to receive professional treatment for psychological injuries. The trial court did not clearly err by determining that they did not necessarily require professional treatment.

4. The trial court did not clearly err by assessing zero points for OV 19, MCL 777.49, which is scored, among other reasons, if the defendant interfered with the administration of justice or the rendering of emergency services. Under OV 19, the court must assess 15 points if the offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services, MCL 777.49(b); 10 points if the offender

otherwise interfered with or attempted to interfere with the administration of justice, MCL 777.49(c); and zero points if the offender did not threaten the security of a penal institution or court or interfere with the administration of justice or the rendering of emergency services by force or threat of force, MCL 777.49(d). Although lying to law enforcement officers or private persons who are authorized to investigate a crime may constitute otherwise interfering with the administration of justice under MCL 777.49(c), that provision, unlike others in MCL 777.49, does not refer to otherwise interfering with emergency services, and the Legislature's inclusion of language in one part of a statute that it omits in another is assumed to be intentional. The trial court's conclusion that defendant had not otherwise interfered with or attempted to interfere with the administration of justice under MCL 777.49(c) by initially telling a detective that she had had a miscarriage or stillbirth was not clearly erroneous because it was supported by evidence that defendant was in postoperative recovery suffering the effects of general anesthesia and blood loss at the time.

5. Adding 25 points to defendant's OV increased her OV level. Because the trial court's scoring error affected the recommended minimum sentence range, resentencing was required.

6. The trial court did not abuse its discretion by departing downward from the recommended minimum sentence range with respect to defendant's second-degree-murder conviction because its decision to do so was based on objective and verifiable factors that were supported by the evidence, including defendant's strong family and community support, lack of criminal record, age, exemplary work record, good behavior while incarcerated, cooperation with the police, and learning disability. However, resentencing was required because the trial court improperly scored OV 3, and the trial court was directed to determine on remand whether its specific departure remained proportionate in light of the new recommended minimum sentence range.

Convictions affirmed; sentence for second-degree murder vacated; case remanded for resentencing.

SENTENCES — SENTENCING GUIDELINES — OFFENSE VARIABLE 19 — INTERFERENCE WITH ADMINISTRATION OF JUSTICE OR RENDERING OF EMERGENCY SERVICES.

Offense variable (OV) 19, MCL 777.49, is scored, among other reasons, if the defendant interfered with the administration of justice or the rendering of emergency services; under OV 19, the court (1) must assess 15 points under MCL 777.49(b) if the offender used force or the threat of force against another person or

the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services, (2) must assess 10 points under MCL 777.49(c) if the offender otherwise interfered with or attempted to interfere with the administration of justice, and (3) must assess zero points under MCL 777.49(d) if the offender did not threaten the security of a penal institution or court or interfere with the administration of justice or the rendering of emergency services by force or threat of force; lying to emergency-services personnel does not constitute otherwise interfering with the administration of justice under MCL 777.49(c).

*Bill Schuette*, Attorney General, *John J. Bursch*, Solicitor General, *Kym L. Worthy*, Prosecuting Attorney, *Timothy A. Baughman*, Chief of Research, Training, and Appeals, and *Ana I. Quiroz*, Assistant Prosecuting Attorney, for the people.

*Daniel J. Rust* for defendant.

Before: MURPHY, C.J., and O'CONNELL and WHITBECK, JJ.

PER CURIAM. In these consolidated appeals, defendant, Emily Portellos, appeals as of right her convictions, following a jury trial, of second-degree murder[1] and first-degree child abuse.[2] The trial court sentenced Portellos to serve 86 to 180 months' imprisonment for her child abuse conviction and 10 to 20 years' imprisonment for her second-degree-murder conviction. The trial court departed downward from the sentencing guidelines' recommended minimum sentence range for the second-degree-murder conviction. The prosecution appeals as of right the trial court's downward departure from the sentencing guidelines and its scoring of offense variables (OVs) 3, 5, and 19. We affirm Portellos's

[1] MCL 750.317.

[2] MCL 750.136b(2).

convictions, but vacate Portellos's sentence for second-degree murder and remand for resentencing.

## I. FACTS

This case arises out of the tragic death of Baby Portellos, a newborn, during the early morning hours of October 14, 2008.

### A. BACKGROUND FACTS

At the time of the baby's birth, Portellos was 28 years old and lived with her mother and brother. Marianne Wright, Portellos's special-education teacher, testified that Portellos was learning-disabled and required extra time to process information, but was not mentally retarded. Wright testified that although Portellos would work well in routine environments, she would not perform well when making quick decisions and judgments.

Portellos worked at a childcare center in Livonia starting in 2004. Kimberly Avendt, the director of the center, testified that Portellos was very good with children and was trustworthy. Avendt testified that Portellos had completed coursework in child development and was waiting for her associate's degree certificate. Avendt testified that Portellos was trained in first aid, CPR, and sudden infant death syndrome. Susan Ianitelli, Portellos's coworker, testified that Portellos was able to handle the paperwork associated with the job after Ianitelli taught her how.

Portellos previously gave birth in 2006. In December of that year, Portellos became ill with sharp abdominal pains. Portellos saw her family doctor, Dr. Muhammed Wasiullah. He examined Portellos and suspected that she might be pregnant. Wasiullah observed that Portel-

los's entire abdomen was swollen, but she did not have a "baby bump." He did not suspect that she was in the final stages of pregnancy. Wasiullah sent Portellos to the emergency room, where she gave birth. Mary Portellos, Portellos's mother, testified that she was shocked that Portellos gave birth. Portellos placed the baby for adoption. Portellos missed six weeks' work, and she explained to coworkers that a cyst had enlarged her abdomen.

In the summer of 2008, a coworker patted Portellos's abdomen and asked if Portellos had "anything to tell." Portellos denied that she was pregnant. Ianitelli advised Portellos to seek medical treatment because she might have another cyst. In July 2008, Mary Portellos and an aunt both saw Portellos undressed, but did not realize she was pregnant. Demetra Christos (a friend of the family) and Marilyn Murphy (the baby's paternal grandmother) testified that they saw Portellos in September and October 2008 at family gatherings, but Portellos did not appear pregnant.

### B. FACTS SURROUNDING BABY PORTELLOS'S DEATH

On the morning of October 14, 2008, Mary Portellos woke at about 6:00 or 7:00 a.m. and called out to Portellos that it was time to get ready for work. Portellos told her that she was ill and could not go to work. Mary Portellos went back to sleep. Avendt testified that around 8:00 a.m., Portellos called her and said that she was sick with food poisoning. Another coworker, Erica Bishop, testified that Portellos called her and said she was sick with bad cramps and intended to go the hospital. Ianitelli testified that she was concerned and exchanged text messages. Portellos informed Ianitelli that she was bleeding and was "going to die." ·

Mary Portellos woke again at about 10:30 or 11:00 a.m. and went to Portellos's room to check on her. She saw that Portellos was pale and weak and that there was a large quantity of blood on the bed and the floor. Portellos told Mary Portellos that she was having a bad menstrual cycle. Mary Portellos insisted that she go to the emergency room. Portellos fainted in the hallway, and Mary Portellos called for an ambulance. Mary Portellos testified that Portellos was going in and out of consciousness, but when emergency medical services arrived, she heard Portellos tell the technician that she was not pregnant.

Dr. Michael Prescott, the emergency room physician, testified that when Portellos arrived, he was alarmed because she was bleeding copiously. Prescott acknowledged that Portellos's blood loss, heart rate, and outward signs were consistent with hemorrhagic shock. He tested Portellos for pregnancy, and the test was positive. He suspected that Portellos was having a miscarriage. Portellos asked Prescott not to discuss her condition with her mother, but Mary Portellos had been present when the pregnancy test showed a positive result. Prescott called the on-call obstetrician-gynecologist, Dr. Shari Maxwell.

Maxwell testified that Portellos was hemorrhaging and that her situation was life-threatening. Maxwell testified that Portellos was in too much pain to cooperate with an examination. When Maxwell asked Portellos to consent to anesthesia, Portellos responded by asking Maxwell not to discuss her condition with Mary Portellos. Portellos eventually signed the consent form. Maxwell operated on Portellos, removed a placenta that remained in Portellos's uterus, and stopped the bleeding. Rachel Pagden, a clinical therapist employed by the hospital, notified the Plymouth Township Police De-

partment that Portellos had received postdelivery treatment but the status of the baby was unknown.

Detective Mary Linton testified that she spoke with Portellos at the hospital after Portellos came out of anesthesia. Pagden was also present. Portellos initially told Linton that she had miscarried. Linton testified that she told Portellos that she knew Portellos had given birth, but Portellos would not admit that she had until Linton agreed not to tell Mary Portellos. Portellos told Linton that she did not want her mother to know about the baby because her mother would kill her. After Linton agreed not to tell Portellos's mother, Portellos informed her that she had given birth, but the baby was stillborn.

Portellos told Linton that she went into labor at around 1:00 a.m., gave birth at about 3:00 a.m., and that the baby was born feet first. Portellos told Linton that the baby had gasped for breath and lay still and that it did not cry. Portellos told Pagden that she was afraid that her mother would hear the baby crying. When asked whether the baby had been breathing, Portellos would only say that it "maybe gasped." Portellos told Linton that she wrapped the baby in towels or sheets and put it in a garbage bag next to her bed. Pagden and Linton testified that they did not ask Portellos how much time had passed between when the baby was born and when Portellos put it in the bag or whether the baby was alive when Portellos put it in the bag.

Portellos told Linton that she read books on labor and childbirth and that she intended to leave the baby at the fire department so that her mother would not find out. Portellos repeatedly informed Linton that she would return home and "bring the baby to you guys."

Plymouth Township Police searched Portellos's room. Officers found the baby inside a garbage bag next to Portellos's bed. One of the officers testified that the bag was open and that he could see a baby inside. Another officer testified that the bag was shut and that he could see a rose-colored towel in the bag. This officer further testified that the baby had been wrapped very tightly in the towel. She was pronounced dead at the scene.

Valerie Lundgren, a labor and delivery nurse at St. Mary Mercy Hospital, testified that she worked the evening of October 15, 2008, and that she checked on Portellos while making her rounds. Lundgren testified that when she asked Portellos if she had a support system, Portellos told her that she intended to take the baby to the fire department and place it for adoption and that she "intended to sneak it out to the fire station in a bag or garbage bag[.]" Lundgren testified that she had to explain that that rule only applied to living children.

Deborah Answorth, the nursing director of the birthing center at St. Mary, testified that she spoke with Portellos on the morning of October 15 at the hospital. Portellos told Answorth that she thought that she might have been pregnant for two weeks. Portellos told Answorth that she did not want her mother to know that she was pregnant.

Answorth testified that Portellos told her that she delivered the baby feet first and that it moved but did not cry. She testified that Portellos told her that she cut the baby's umbilical cord and that a lot of blood came out. She testified that Portellos told her that "after a time she thought the baby was not alive and then put it in . . . a bag next to the bed." Answorth testified that Portellos said she placed the baby in the bag a few hours after it was born.

Answsworth testified that doctors always deliver a baby in a breech position by cesarean section because these deliveries are dangerous and breech babies often need to be resuscitated after birth. She testified that normally a person clamps the umbilical cord with two clamps and cuts between the clamps to minimize bleeding and that incidents in which the umbilical cord broke during delivery were medical emergencies because the mother and baby would both bleed excessively. Answsworth testified that after 5 or 10 minutes of bleeding through the cord, the baby would start to suffer from heart rate and respiration problems.

Dr. Cheryl Loewe, the Wayne County Deputy Chief Medical Examiner, performed an autopsy on the baby. Loewe testified that the baby was born full term and that her lung tissues contained air, which indicated that she took at least one breath. Loewe testified that the baby showed no signs of drugs, alcohol, disease, or defects. She testified that if the baby had been born with medical supervision, she would have survived. Loewe testified that she studied the baby's tissues and did not believe that she had bled to death.

Loewe testified that she concluded that Baby Portellos's cause of death was asphyxia by smothering and that the circumstances surrounding the baby's death indicated that it was a homicide. Loewe testified that it is extremely easy to smother a newborn and that the baby's airways had been clear. She testified that wrapping a baby tightly in a towel or sealing it in a plastic bag would be enough to smother it. Linton opined that Portellos smothered the baby so that her mother would not hear the baby cry.

The prosecution charged Portellos with first-degree child abuse; first-degree premeditated murder, including the lesser offenses of second-degree murder and

voluntary manslaughter; and first-degree felony murder with first-degree child abuse as the underlying felony. The trial court instructed the jury that to convict Portellos of first-degree child abuse, it must find that Portellos "knowingly or intentionally caused serious physical harm . . . to Baby Portellos. By serious physical harm, I mean any physical injury to a child that seriously impairs the child's health or physical well-being . . . ." The trial court instructed the jury that it could convict Portellos of second-degree murder if it found that she (1) intended to kill, (2) intended to do great bodily harm to, or (3) took actions and knowingly created a very high risk of death or great bodily harm to Baby Portellos. The jury found Portellos guilty of first-degree child abuse and second-degree murder and acquitted Portellos of first-degree premeditated murder and first-degree felony murder.

### C. SENTENCING

The prosecution argued for the trial court to assess 25 points for OV 3 (physical injury to the victim)[3] because Portellos inflicted a life-threatening or fatal injury on the baby. The trial assessed zero points for OV 3 because the jury might have found that Baby Portellos died from a lack of medical care on the basis of the conflicting evidence surrounding the baby's death.

The prosecution argued for the trial court to assess 10 points for OV 5 (psychological injury to a member of the victim's family)[4] because Murphy submitted a letter that spoke about her disbelief, grief, anger, and heartbreak at the loss of Baby Portellos. Counsel for Portellos argued that Murphy's letter reflected a normal grieving process

---

[3] MCL 777.33.

[4] MCL 777.35.

and there was no evidence that Murphy sought or required counseling. Murphy addressed the court at sentencing and stated that she hoped that Portellos could receive the counseling that she would need. The trial court assessed zero points for OV 5 because of the lack of evidence that the victim's family required counseling.

The prosecution argued for the trial court to assess 10 points for OV 19 (interference with the administration of justice)[5] because Portellos lied that she was not pregnant and it wasted police and medical resources. Counsel for Portellos argued that Portellos was literally bleeding to death or recovering from anesthesia when she was initially questioned and that she cooperated with Linton. The trial court found that Portellos had not used force against or fled from medical responders and that "some act other than conduct" did not apply under the circumstances of the case. The trial court assessed zero points for OV 19.

The sentencing information report as scored by the trial court resulted in a recommended minimum sentencing range of 162 to 270 months for the second-degree-murder conviction. The trial court found several substantial and compelling reasons to depart downward from the sentencing guidelines range and determined that a sentence of 10 to 20 years' (120 to 240 months') imprisonment was more proportionate to Portellos's crime.

## II. SUFFICIENCY OF THE EVIDENCE

In Docket No. 301333, Portellos argues that there was insufficient evidence of her state of mind to support the jury's verdict on second-degree murder and first-degree child abuse because there was no evidence that Portellos intended to harm or kill her baby.

[5] MCL 777.49.

### A. STANDARD OF REVIEW

A claim that the evidence was insufficient to convict a defendant invokes that defendant's constitutional right to due process of law.[6] This Court reviews de novo the sufficiency of the evidence on appeal.[7] When reviewing a challenge to the sufficiency of the evidence, we review the evidence in a light most favorable to the prosecution to determine whether a rational trier of fact could find that the essential elements of the crime were proved beyond a reasonable doubt.[8]

### B. LEGAL STANDARDS

The elements of second-degree murder are "(1) a death, (2) caused by an act of the defendant, (3) with malice, and (4) without justification or excuse."[9] Malice includes the intent to kill, the intent to cause great bodily harm, or the intent to take an action whose natural tendency is to cause death or great bodily harm, wantonly and willfully disregarding that risk.[10]

"Voluntary manslaughter is an intentional killing committed under the influence of passion or hot blood produced by adequate provocation and before a reasonable time has passed for the blood to cool."[11] Provocation is necessary to negate the presence of malice.[12]

---

[6] *People v Wolfe*, 440 Mich 508, 514; 489 NW2d 748 (1992); *In re Winship*, 397 US 358, 364; 90 S Ct 1068; 25 L Ed 2d 368 (1970).

[7] *People v Hawkins*, 245 Mich App 439, 457; 628 NW2d 105 (2001).

[8] *People v Tombs*, 472 Mich 446, 459; 697 NW2d 494 (2005); *People v Reese*, 491 Mich 127, 139; 815 NW2d 85 (2012).

[9] *People v Goecke*, 457 Mich 442, 463-464; 579 NW2d 868 (1998).

[10] *Id.* at 464.

[11] *People v Hess*, 214 Mich App 33, 38; 543 NW2d 332 (1995).

[12] See *Reese*, 491 Mich at 144; *People v Mendoza*, 468 Mich 527, 535-536; 664 NW2d 685 (2003).

"A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child."[13] A defendant must not only act, but must know that the act will cause serious physical harm.[14]

"Circumstantial evidence and reasonable inferences that arise from the evidence can constitute sufficient proof of the elements of a crime."[15] Minimal circumstantial evidence is sufficient to prove the defendant's state of mind.[16]

### C. APPLYING THE STANDARDS

Portellos argues that there was insufficient evidence of malice to support her first-degree child abuse and second-degree murder convictions because she did not knowingly or intentionally harm baby Portellos. We disagree.

We conclude that sufficient evidence supported the jury's verdicts of second-degree murder and first-degree child abuse. Viewing the evidence in the light most favorable to the prosecution, Portellos was trained in first aid, CPR, and sudden infant death syndrome. Portellos knew she was pregnant for a few weeks. She hid her pregnancy from her mother and told witnesses that she was afraid that her mother would find out about the pregnancy. Portellos read books on labor and delivery and decided to give birth to her baby at home, unassisted. Portellos had a cellular phone. Even after determining that the baby was being born breech, Portellos did not call for assistance. However, Portellos

---

[13] MCL 750.136b(2).

[14] *People v Maynor*, 470 Mich 289, 295; 683 NW2d 565 (2004).

[15] *People v Akins*, 259 Mich App 545, 554; 675 NW2d 863 (2003).

[16] *People v Fennell*, 260 Mich App 261, 270-271; 677 NW2d 66 (2004).

had the presence of mind to call her supervisor and coworkers to explain her absence at work. And even after the baby did not cry when she was born, but only gasped a little and did not move, Portellos still did not call for medical assistance. She instead wrapped the baby tightly in a towel. Portellos then placed the baby in a garbage bag.

Portellos argues that evidence of provocation negated the evidence of malice in this case, because she was alarmed that the unexpected birth of a baby would enrage her mother and cause serious repercussions. Portellos does not provide any authority to support the proposition that an unexpected birth or the fear of another person are the types of "adequate provocation" contemplated by the law governing voluntary manslaughter. Parties may not "merely announce their position and leave it to this Court to discover and rationalize the basis for their claims," and we may consider unsupported issues abandoned.[17] We conclude that Portellos has abandoned this issue.

On the basis of the facts in this case, a reasonable juror could conclude that Portellos intentionally smothered Baby Portellos so that Mary Portellos would not hear the baby cry. A reasonable juror could alternatively conclude that the baby died (1) because Portellos failed to summon medical assistance, (2) from being wrapped tightly in a towel, or (3) from being placed in the garbage bag. A reasonable juror could infer from these facts that Portellos knew that the natural and probable consequence of those actions included death or serious injury to Baby Portellos. We conclude that sufficient evidence supports Portellos's convictions of first-degree child abuse and second-degree murder because a rea-

---

[17] *VanderWerp v Plainfield Charter Twp*, 278 Mich App 624, 633; 752 NW2d 479 (2008).

sonable juror could find that Portellos intentionally took actions that caused the baby's death or knowingly took those actions with a wanton disregard of the risks.

### III. SENTENCING

In Docket No. 301190, the prosecution argues that the trial court improperly scored OVs 3, 5, and 19 and that the trial court abused its discretion when it departed downward from the sentencing guidelines.

#### A. THE TRIAL COURT'S SENTENCING GUIDELINES SCORES

##### 1. STANDARD OF REVIEW

The proper interpretation and application of the sentencing guidelines is a question of law that this Court reviews de novo.[18] We review the sentencing court's scoring of a sentencing guidelines variable for clear error.[19] A scoring decision is not clearly erroneous if the record contains any evidence supporting the decision.[20]

##### 2. PHYSICAL INJURY UNDER OV 3

The prosecution argues that the trial court improperly assessed zero points for OV 3. We agree.

Offense variable 3 is scored when a victim was physically injured:

> (1) Offense variable 3 is physical injury to a victim. Score offense variable 3 by determining which of the following apply and by assigning the number of points attributable to the one that has the highest number of points:
>
> (a) A victim was killed ................................... 100 points

---

[18] *People v Morson*, 471 Mich 248, 255; 685 NW2d 203 (2004).

[19] *People v Lockett*, 295 Mich App 165, 182; 814 NW2d 295 (2012).

[20] *Id.*

(b) A victim was killed ..................................... 50 points

(c) Life threatening or permanent incapacitating injury occurred to a victim ............................................. 25 points

\* \* \*

(f) No physical injury occurred to a victim ..... 0 points[21]

However, the trial court may not assess 100 points for OV 3 if homicide is the sentencing offense.[22] Nor may the trial court assess 50 points for OV 3 unless a motor vehicle is involved.[23] But the trial court may not assess zero points for OV 3 if the defendant is convicted of a homicide offense and the victim is killed.[24] If the victim is killed, the trial court must assign 25 points unless a higher score applies.[25]

In this case, the trial court sentenced Portellos for second-degree murder. Second-degree murder is a homicide offense.[26] Thus, the trial court could not assign 100 points for OV 3. It could not assign 50 points because there was no motor vehicle involved. The next highest possible score was 25 points.

The parties do not dispute that the victim died. The trial court declined to assess 25 points for OV 3 because of the conflicting evidence surrounding the baby's manner of death—whether she died from birth trauma, improper cutting of the umbilical cord, or smothering. But nothing in the language of OV 3 addresses how the injury that killed the victim occurred.[27] The trial court

---

[21] MCL 777.33.

[22] MCL 777.33(2)(b); *People v Houston*, 473 Mich 399, 405; 702 NW2d 530 (2005); *People v Laidler*, 491 Mich 339, 343; 817 NW2d 517 (2012).

[23] MCL 777.33(2)(c); *People v Hindman*, 472 Mich 875, 876 (2005).

[24] *Houston*, 473 Mich at 405-406.

[25] *Id*. at 407.

[26] See *id*. at 405, 407.

[27] See MCL 777.33.

must assign 25 points if a life-threatening or permanent incapacitating injury occurred to a victim.[28] An injury that actually causes death is a life-threatening injury for purposes of OV 3.[29] With respect to the provisions of OV 3 that directly require a causal link to support a given score, the defendant's conduct need not be the sole cause of the victim's death.[30] We conclude that when the trial court determines whether it must assign 25 points because the defendant caused the victim's death, it should do so in the same manner as it determines whether the defendant caused the victim's death under those provisions. Thus, the question is whether, but for the defendant's conduct, the victim's death would have occurred.[31] The defendant's conduct need not be the *sole* cause of the victim's death.[32]

In this case, but for Portellos's conduct, the baby would not have died. The conditions surrounding the baby's birth certainly contributed to her death. And that the jury found Portellos guilty of first-degree child abuse and second-degree murder indicates that Portellos was accountable for her death. We conclude that the trial court erred when it assessed zero points for OV 3. The trial court properly should have assessed 25 points.

### 3. PSYCHOLOGICAL INJURY UNDER OV 5

The prosecution argues that the trial court erred when it assessed zero points for OV 5 and that it should have assessed 15 points. We disagree.

---

[28] MCL 777.33(1)(c).

[29] See *Houston*, 473 Mich at 407 n 16.

[30] See *Laidler*, 491 Mich at 344-346 (addressing MCL 777.33(2)(b), which requires a score of 100 points for a death that "results" from a crime).

[31] See *id*. at 345.

[32] See *id*. at 346.

The trial court must assess 15 points for OV 5 if "[s]erious psychological injury requiring professional treatment occurred to a victim's family."[33] The trial court must assess zero points for OV 5 if "[n]o serious psychological injury requiring professional treatment occurred to a victim's family."[34] Whether a victim has in fact sought treatment is not determinative.[35]

In this case, the prosecution argued that Marilyn Murphy (the baby's paternal grandmother) and Robert Murphy (the baby's father) suffered serious psychological injuries that might require treatment. However, both Marilyn and Robert Murphy spoke at the sentencing hearing. Though Marilyn Murphy expressed her emotional response to the baby's death, she did not state that she intended to receive treatment. Nor did Robert Murphy state that he intended to receive treatment. Marilyn Murphy only stated that she hoped that Portellos would be able to receive treatment while in prison. We conclude that the trial court did not clearly err when it determined that the Murphys did not necessarily require professional treatment.

### 4. INTERFERENCE WITH THE ADMINISTRATION OF JUSTICE UNDER OV 19

The prosecution argues that the trial court erred when it assessed zero points for OV 19 and that it instead should have assessed 10 points. The prosecution argues that the trial court improperly interpreted OV 19 as having a limited scope. We disagree.

The trial court should score OV 19 if, among other things, the defendant "interfere[d] with the administra-

---

[33] MCL 777.35(1)(a).

[34] MCL 777.35(1)(b).

[35] MCL 777.35(2).

tion of justice or the rendering of emergency services."[36] This offense variable, MCL 777.49, provides in part that the trial court should assess points when the following occur:

> (b) The offender used force or the threat of force against another person or the property of another person to interfere with, attempt to interfere with, or that results in the interference with the administration of justice or the rendering of emergency services ......................... 15 points

> (c) The offender otherwise interfered with or attempted to interfere with the administration of justice ... 10 points

> (d) The offender did not threaten the security of a penal ⋅ institution or court or interfere with or attempt to interfere with the administration of justice or the rendering of emergency services by force or threat of force ..... 0 points

Lying to law enforcement officers or private persons who are authorized to investigate a crime may constitute interference with their investigatory function, which is interference with the administration of justice under MCL 777.49(c).[37]

The prosecution argues that Portellos lied to medical personnel, which otherwise interfered with the provision of emergency services. However, MCL 777.49(c) does not contain any reference to otherwise interfering with emergency services. If the plain and ordinary meaning of a statute's language is clear, we will not engage in judicial construction.[38] When the Legislature includes language in one part of a statute that it omits in another, we assume that the omission was intentional.[39] Interference with emergency services is men-

---

[36] MCL 777.49.

[37] *People v Barbee*, 470 Mich 283, 287-288; 681 NW2d 348 (2004); *People v Passage*, 277 Mich App 175, 180; 743 NW2d 746 (2007).

[38] *People v Breidenbach*, 489 Mich 1, 8; 798 NW2d 738 (2011).

[39] *People v Peltola*, 489 Mich 174, 185; 803 NW2d 140 (2011).

tioned several other times throughout MCL 777.49, but it is not included in MCL 777.49(c). MCL 777.49(c) is the only part of OV 19 that includes other conduct, such as deceit. We conclude that had our Legislature wished the trial court to assess 10 points under OV 19 for otherwise interfering with the rendering of emergency services, it clearly would have included language to reach that result. The trial court correctly determined that it should not assign 10 points for OV 19 for lying to medical services personnel.

The trial court also considered whether Portellos otherwise interfered with or attempted to interfere with the administration of justice under MCL 777.49(c), and it concluded that MCL 777.49(c) did not apply to the facts of this case. The prosecution argued that Portellos originally told Linton that she had had a miscarriage or stillbirth before telling her the truth. Portellos argued that she told Linton the location of the baby within minutes and had otherwise cooperated with questioning.

The trial court determined that the "delay would be attributable to the fact that she was in [postoperative recovery] . . . [s]uffering the effects of anesthesia." Pagden testified that Portellos was oriented with respect to time, person, and place and was not still "loopy," but also testified that Portellos had frequently repeated herself and did not appear to understand the severity of her behavior. Answorth also testified that later that morning, Portellos still had difficulty focusing and that she might attribute Portellos's condition to blood loss. Dr. Philip Wolok, Portellos's anesthesiologist, testified that he would have recommended against Portellos's discussing legal issues or signing legal documents for 24 hours after receiving general anesthesia because patients who have recently had general anes-

thesia might be lucid but impaired. We conclude that the trial court's determination that Portellos did not interfere with the administration of justice was not clearly erroneous because there was evidence to support its decision.

### 5. RESENTENCING IS REQUIRED

Adding 25 points to Portellos's OV score increases it from 35 points to 60 points, and increases her OV level with respect to the second-degree murder conviction from level I to level II.[40] If a mistaken score affects the defendant's recommended minimum sentence range, we should remand for resentencing.[41] Because the trial court's scoring error affected the appropriate guidelines range, we must vacate Portellos's sentence for this conviction and remand for resentencing.

### B. THE TRIAL COURT'S DEPARTURE FROM THE SENTENCING GUIDELINES

### 1. STANDARD OF REVIEW

When reviewing a trial court's grounds for departing from the sentencing guidelines, this Court reviews for clear error the trial court's factual finding that a particular factor supporting the departure exists.[42] A finding is not clearly erroneous if there is any evidence to support it.[43]

We review de novo whether a factor is objective and verifiable.[44] We review for an abuse of discretion the trial court's determination that the factors in a particu-

---

[40] MCL 777.16p; MCL 777.61.

[41] See *People v Francisco*, 474 Mich 82, 89-90; 711 NW2d 44 (2006).

[42] *People v Babcock*, 469 Mich 247, 264; 666 NW2d 231 (2003).

[43] *Lockett*, 295 Mich App at 182.

[44] *Babcock*, 469 Mich at 264.

lar case are substantial and compelling reasons to depart from the guidelines and also review for an abuse of discretion the degree of the trial court's departure.[45] An abuse of discretion occurs when the trial court chooses an outcome falling outside the range of principled outcomes.[46]

### 2. LEGAL STANDARDS

Our Legislature has enacted sentencing guidelines.[47] A trial court may depart from the appropriate guidelines range only if it states on the record substantial and compelling reasons for the departure and the facts that support those reasons are objective and verifiable, keenly grab our attention, and are of "considerable worth" when determining a sentence.[48] Facts are objective and verifiable when they are actions or occurrences external to the mind and are capable of being confirmed.[49]

Further, the trial court's departure must be proportionate to the defendant's conduct and criminal history.[50] The trial court must justify the particular departure it made by explaining "why the sentence imposed is more proportionate than a sentence within the guidelines recommendation would have been."[51] The trial court may justify its departure by comparing the facts of the defendant's case against the sentencing grid to explain why its sentence is more proportionate.[52]

---

[45] *Id.* at 264-265; *People v Smith*, 482 Mich 292, 300; 754 NW2d 284 (2008).

[46] *Babcock*, 469 Mich at 269.

[47] MCL 769.34.

[48] MCL 769.34(3); *Babcock*, 469 Mich at 257, 272 (citation and quotation marks omitted).

[49] *People v Abramski*, 257 Mich App 71, 74; 665 NW2d 501 (2003).

[50] *Smith*, 482 Mich at 300.

[51] *Id.* at 304.

[52] *Id.* at 306, 309-310.

### 3. APPLYING THE STANDARDS

The prosecution argues that the trial court clearly erred in certain factual findings during sentencing and abused its discretion by departing downward from the sentencing guidelines with respect to the second-degree-murder conviction because its reasons for doing so were not objective and verifiable and were not substantial and compelling. We disagree.

The trial court's several reasons for departing downward from the sentencing guidelines' recommended minimum sentence range included the following: (1) Portellos's strong family and community support, (2) that Portellos had no prior criminal record, was 30 years old, had a solid job history as an exemplary employee, and did not require any disciplinary actions while incarcerated, (3) that Portellos cooperated with the police, and (4) that Portellos was learning disabled and did not make good decisions under pressure.

The prosecution argues that the trial court improperly considered that Portellos cooperated with law enforcement. A defendant's cooperation with law enforcement is objective and verifiable.[53] As we stated earlier, the trial court's finding that Portellos cooperated with police was supported by the record evidence and was not clearly erroneous.

The prosecution argues that the ability of the victim's family to forgive the defendant is not objective and verifiable because it is similar to a defendant's lack of remorse. However, the Michigan Supreme Court has held that a defendant's strong family and community support is an objective and verifiable factor that may "weigh[] heavily in favor of a deviation from the statu-

---

[53] *People v Daniel*, 462 Mich 1, 7; 609 NW2d 557 (2000).

tory minimum."[54] Unlike a defendant's remorse, whether a defendant has family and community support is external to the mind and capable of being confirmed. In this case, there was evidence that Portellos did not have a supportive mother. But the trial court determined that Portellos's strong family and community support was demonstrated by the numerous letters of support that it received. We conclude that the trial court's finding was not clearly erroneous because it was supported by evidence.

The mitigating circumstances surrounding the offense and the defendant's criminal record, work history, and age are also objective and verifiable factors that the trial court may consider.[55] Though the defendant's lack of criminal record alone is not a substantial and compelling factor,[56] it may become a substantial and compelling factor when considered in conjunction with the defendant's age and other history.[57] In this case, the trial court considered Portellos's lack of a criminal record in conjunction with other factors. The trial court found that Portellos was 30 years old, had no prior record, had no disciplinary actions while awaiting trial and sentencing, and had attained and maintained steady employment, promotions, and an associate's degree despite her learning disability. These findings were not clearly erroneous because they were supported by the testimony of witnesses at trial.

Finally, the prosecution argues that the trial court's finding that Portellos's learning disability diminished her ability to make decisions was clearly erroneous. The

---

[54] *People v Fields*, 448 Mich 58, 78-79; 528 NW2d 176 (1995); see also *People v Shinholster*, 196 Mich App 531, 535; 493 NW2d 502 (1992).

[55] *Daniel*, 462 Mich at 7; *Fields*, 448 Mich at 80.

[56] *People v Young*, 276 Mich App 446, 455-456; 740 NW2d 347 (2007).

[57] See *id.* at 456 n 1; *Daniel*, 462 Mich at 7.

trial court's finding that Portellos had a learning disability was supported by the testimony of Wright, her special-education teacher. Wright testified that Portellos was learning-disabled, that she required extra time to process information, and that she did not perform well when making quick decisions and judgments. We conclude that the trial court's determinations on these factors were not clearly erroneous because record evidence supported them.

Therefore, the factors the trial court considered were objective and verifiable and supported by the evidence. The unusual factual circumstances of this case keenly grabbed the trial court's attention; it noted that the circumstances of this case were far from typical for second-degree-murder cases. Further, these factors were of considerable worth because they might indicate Portellos's potential for rehabilitation.[58] We conclude that the trial court did not abuse its discretion when it determined that these reasons were substantial and compelling reasons to depart downward from the guidelines in this case. The trial court's outcome did not fall outside the range of reasonable and principled outcomes, which changed the guidelines' recommended minimum sentence range for the second-degree-murder conviction.

However, resentencing is required because the trial court improperly scored OV 3, which changed the guidelines' recommended minimum sentence range for the second-degree-murder conviction.[59] When it departed from the sentencing guidelines, the trial court properly justified the proportionality of its sentence by comparing it to the sentencing grid. On resentencing, the trial court should determine whether its specific

---

[58] See *Fields*, 448 Mich at 78.

[59] See MCL 777.16p; MCL 777.61.

departure remains proportionate in light of the sentence recommended by the guidelines.

We affirm Portellos's convictions of first-degree child abuse and second-degree murder. We vacate Portellos's sentence for second-degree murder and remand for resentencing by the sentencing judge, Judge Daniel Patrick Ryan. We do not retain jurisdiction.

MURPHY, C.J., and O'CONNELL and WHITBECK, JJ., concurred.