*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

UNPUBLISHED
April 30, 2020

Plaintiff-Appellee,

v

No. 346235
Wayne Circuit Court
LC No. 18-003820-01-FC

BRAD EDWARD FIELDS,

Defendant-Appellant.

Before: MURRAY, C.J., and RONAYNE KRAUSE and TUKEL, JJ.

PER CURIAM.

Defendant appeals as of right his jury trial convictions of first-degree murder committed in the perpetration of a felony (felony murder), MCL 750.316(b); first-degree child abuse (CA-I), MCL 750.136b(2); torture, MCL 750.85; conspiracy to commit first-degree child abuse (conspiracy to commit CA-I), MCL 750.136b(2) and MCL 750.157A; and conspiracy to commit second-degree child abuse (conspiracy to commit CA-II), MCL750.136b(3)(c) and MCL 750.157A (person knowingly or intentionally commits an act likely to cause serious physical or mental harm to a child).[1] Defendant was sentenced to life imprisonment for the felony murder conviction, 30 to 60 years' imprisonment each for the CA-I conviction and for the torture conviction and 2 to 10 years' imprisonment each for the conspiracy to commit CA-I conviction and for the conspiracy to commit CA-II conviction. On appeal, defendant argues the evidence is insufficient to sustain the conviction of felony murder on a theory of aiding and abetting, MCL 767.39.[2] We affirm. This appeal is being decided without oral argument pursuant to MCR 7.214(E)(1).

---

[1] Defendant was also convicted of second-degree murder, MCL 750.317, on the basis of the events giving rise to this case. The prosecutor entered a *nolle prosequi* for the second-degree murder conviction because defendant was convicted of felony murder for the same events.

[2] The jury was properly instructed as to the elements of all charged offenses and that it could also convict defendant as a principal if he aided and abetted the commission of a crime. On appeal, the

-1-

# I. STATEMENT OF FACTS

This case arises out of the physical abuse and death of the victim, a four-year-old child. The victim's mother, Candice Diaz, met and began a romantic relationship with defendant when the victim was approximately 18 months old. Diaz moved in with defendant into defendant's residence, while the victim remained living with her maternal grandmother and occasionally visited Diaz. Defendant and Diaz had another child together. The victim was toilet trained, but had occasional toilet-related "accidents" while living with her maternal grandmother.

When the victim was approximately four years old, she moved into defendant's residence with defendant, Diaz, and their child in order to begin preschool. After the victim resided at defendant's residence for roughly four months, on January 1, 2018, Diaz called her maternal grandmother about 9:30 a.m. and informed her that Diaz went into the bathroom and found the victim unresponsive. The maternal grandmother drove to defendant's residence and arrived about 30 minutes later to find the victim unresponsive on the bathroom floor. Defendant was attempting to administer cardiopulmonary resuscitation (CPR) to the victim. The maternal grandmother urged Diaz and defendant to call the police, and someone called 911.

When the responding police officers arrived at defendant's residence, the victim remained unresponsive and there were no signs of life. The police officers noticed that the victim had what appeared to be severe burns on portions of her feet, legs, buttocks, and arms. One of the officers asked, "how did she get all bloody?[3]" Diaz replied that the victim had been like that when Diaz woke up, and she did not know what the victim had been up to all night. Diaz and defendant claimed that the victim had been awake all night, and took a bath while Diaz cooked breakfast. Both alleged that when Diaz returned to the bathroom, she noticed the victim had vomited and become submerged in the bathtub. Diaz and defendant expressed their belief the victim drowned because attempts to provide CPR resulted in water spraying out of her body. When asked about the burns on the victim's body, defendant disavowed any knowledge of their origins. The police officers and emergency responders administered CPR to the victim. Diaz and defendant expressed the belief that the victim had been "down" approximately half an hour in the water at that point. However, although the victim's hair was damp, her body was not. Officers did not observe any water on the floor in the bathroom, nor did the adults appear to be wet.

The victim and Diaz were transported by ambulance to St. Joseph Mercy Hospital. A paramedic who rode in the ambulance did not observe any water in the victim's throat or lungs while intubating the victim. She also noted that the victim's fingertips were not as "pruned" as

---

prosecution apparently agrees that defendant's felony murder conviction is premised on the aiding and abetting theory. Defendant does not appeal any of his other convictions.

[3] A police body-camera video was admitted into evidence, in which responding officers took the victim from the bathroom to the living room and performed CPR on the victim. In the video, the victim has large and dramatically apparent red marks on her arms and legs. It is not clear from the recording itself whether the marks are blood, or patches of skin that had been scalded off.

typically occurred while taking a bath. The victim was pronounced dead approximately two hours after her arrival at the hospital.

Later that day, a search warrant was obtained for defendant's residence. Defendant was no longer present at that time. The search of defendant's residence uncovered chunks of skin and clumps of hair later identified as belonging to the victim in the bathtub drain. A garbage bag with several pieces of bloody gauze, clumps of hair with blood stains, plastic gloves, an empty bottle of hydrogen peroxide, and boxes of topical ointment were found in the laundry room. The clumps of hair were found to have DNA belonging to the victim, while defendant and the victim's DNA was found on several pairs of the recovered gloves. There was no bedding in the victim's bedroom, and the bed was leaned against the wall.

A few days later, a warrant for the arrest of defendant and Diaz was authorized. Authorities were unable to locate defendant and Diaz until they were found and arrested several days later in Lowndes County, Georgia. While driving with an officer in Lowndes County, defendant stated that "all of this was just a misunderstanding, and that they were on their way back to Michigan to turn themselves in to the U.S. Marshal's Office." Diaz and defendant were extradited back to Michigan. Diaz was originally a codefendant in this matter, but she was not involved in defendant's trial; she ultimately entered into a plea agreement and was convicted of first-degree child abuse and second-degree murder.

Defendant and Diaz's cellular telephones and Facebook Messenger messages were obtained as part of the investigation. While defendant's cellular telephone had been manually factory reset, erasing its contents, investigating officers were able to obtain text messages exchanged between Diaz and defendant through Diaz's cellular telephone. These text messages, as well as several messages sent between defendant and other individuals through the Facebook Messenger application, were highlighted in the jury trial. The text and Facebook messages documented defendant's and Diaz's discussions regarding the victim's toilet-related accidents in the home and their ensuing methods of discipline. These messages revealed, in part, that defendant repeatedly struck the victim, frequently subjected her to cold baths, "shanked" her with a fork, forcefully scratched her back with his nails, hit her in the mouth, and gave her unprescribed Adderall.

After an autopsy, the cause of death was attributed to multiple inflicted injuries, including blunt force trauma, a fatal burn pattern, thermal injuries, and asphyxia injuries. Her body was described as "somewhat emaciated" and had indications of having been suffocated by a hand placed over her mouth and nose. Physical, medical, and dental neglect also contributed to the victim's death. A toxicology report revealed the presence of caffeine and amphetamines. Furthermore, there was nothing characteristic of a death by drowning found in the autopsy. The victim also exhibited a spectrum of injuries referred to as battered-child syndrome, second-degree scalding burns at various locations on her body, matted and lice-ridden hair with several contusions to her scalp, malnourishment, some degree of decay or necrosis in all of her teeth, numerous lacerations and other injuries in various stages of healing, and significant bruising, among other injuries. The pathologist who performed the autopsy opined that the victim would have been in extreme pain from the burns, dental decay, and infliction of bruises and abrasions.

## II. DISCUSSION

Defendant argues that there was insufficient evidence for a jury to reasonably infer that defendant participated in, and had the intent to participate in, the commission of the first-degree child abuse and torture of the victim in order to find him guilty of felony murder under an aiding and abetting theory. We disagree.

### A. STANDARD OF REVIEW

In evaluating a challenge to the sufficiency of the evidence, this Court reviews the evidence de novo "in the light most favorable to the prosecution to determine whether a rational trier of fact could have found the essential elements of the crime to have been proved beyond a reasonable doubt." *People v Meissner*, 294 Mich App 438, 452; 812 NW2d 37 (2011). "This Court will not interfere with the trier of fact's role of determining the weight of the evidence or the credibility of witnesses." *People v Kanaan*, 278 Mich App 594, 619; 751 NW2d 57 (2008). "All conflicts in the evidence must be resolved in favor of the prosecution." *Id*. "Circumstantial evidence and reasonable inferences arising from that evidence can constitute satisfactory proof of the elements of a crime." *People v Carines*, 460 Mich 750, 757; 597 NW2d 130 (1999) (quotation omitted). "It is for the trier of fact, not the appellate court, to determine what inferences may be fairly drawn from the evidence and to determine the weight to be accorded those inferences." *People v Hardiman*, 466 Mich 417, 428; 646 NW2d 158 (2002). This Court will reverse a trial court's finding of fact only if "this Court is left with a definite and firm conviction that a mistake has been made." *People v Brown*, 205 Mich App 503, 505; 517 NW2d 806 (1994).

### B. PRINCIPLES OF LAW

"The elements of felony murder are (1) the killing of a human being, (2) with the intent to kill, to do great bodily harm, or to create a very high risk of death or great bodily harm with knowledge that death or great bodily harm was the probable result, (3) while committing, attempting to commit, or assisting in the commission of any of the felonies specifically enumerated in MCL 750.316(1)(b)." *People v Gayheart*, 285 Mich App 202, 210; 776 NW2d 330 (2009). "In other words, felony murder is essentially second-degree murder, elevated by one of the felonies enumerated in MCL 750.316." *People v Maynor*, 256 Mich App 238, 243-244; 662 NW2d 468 (2003), aff'd on other grounds 470 Mich 289 (2004).

Both first-degree child abuse and torture are enumerated as predicate felonies for the purposes of felony murder. See MCL 750.316(1)(b). "A person is guilty of child abuse in the first degree if the person knowingly or intentionally causes serious physical or serious mental harm to a child." *Maynor*, 256 Mich App at 240, quoting MCL 750.136b(2). " 'Serious physical harm' means any physical injury to a child that seriously impairs the child's health or physical well-being, including brain damage, a skull or bone fracture, subdural hemorrhage, dislocation, sprain, internal injury, poisoning, burn or scald, or severe cut." MCL 750.136b(1)(f).

Torture is defined in MCL 750.85, which states, in pertinent part:

(1) A person who, with the intent to cause cruel or extreme physical or mental pain and suffering, inflicts great bodily injury or severe mental pain or suffering upon

-4-

another person within his or her custody or physical control commits torture and is guilty of a felony punishable by imprisonment for life or any term of years.

(2) As used in this section:

> (a) "Cruel" means brutal, inhuman, sadistic, or that which torments.
>
> (b) "Custody or physical control" means the forcible restriction of a person's movements or forcible confinement of the person so as to interfere with that person's liberty, without that person's consent or without lawful authority.
>
> (c) "Great bodily injury" means either of the following:
>
>> (*i*) Serious impairment of a body function as that term is defined in section 58c of the Michigan vehicle code, 1949 PA 300, MCL 257.58c.
>>
>> (*ii*) One or more of the following conditions: internal injury, poisoning, serious burns or scalding, severe cuts, or multiple puncture wounds.
>
> (d) "Severe mental pain or suffering" means a mental injury that results in a substantial alteration of mental functioning that is manifested in a visibly demonstrable manner caused by or resulting from any of the following:
>
>> (*i*) The intentional infliction or threatened infliction of great bodily injury.
>>
>> (*ii*) The administration or application, or threatened administration or application, of mind-altering substances or other procedures calculated to disrupt the senses or the personality.

\* \* \*

(3) Proof that a victim suffered pain is not an element of the crime under this section. [See also *People v Schaw*, 288 Mich App 231, 233-234; 791 NW2d 743 (2010), quoting MCL 750.85.]

Under an aiding and abetting theory, one who procures, counsels, aids, or abets in the commission of a crime may be convicted as a principal. *People v Robinson*, 475 Mich 1, 5-6; 715 NW2d 44 (2006), quoting MCL 767.39. Unlike conspiracy and felony murder, which also allow the state to punish a person for the acts of another, aiding and abetting is not a separate substantive offense. Rather, "being an aider and abettor is simply a theory of prosecution that permits the imposition of vicarious liability for accomplices." *Id*. at 6 (footnotes and quotation omitted). To convict a defendant for an offense under an aiding and abetting theory, the prosecutor must demonstrate:

(1) the crime charged was committed by the defendant or some other person; (2) the defendant performed acts or gave encouragement that assisted the commission of the crime; and (3) the defendant intended the commission of the crime or had knowledge that the principal intended its commission at the time that [the defendant] gave aid and encouragement. [*Id.*, quoting *People v Moore*, 470 Mich 56, 67-68; 679 NW2d 41 (2004) (alteration in original).]

"Mere presence, even with knowledge that an offense is about to be committed or is being committed, is insufficient to establish that a defendant aided or assisted in the commission of the crime." *People v Norris*, 236 Mich App 411, 419-420; 600 NW2d 658 (1999). However, "the amount of advice, aid, or encouragement provided by a defendant is not material if it had the effect of inducing the commission of the crime." *Moore*, 470 Mich at 71. "A defendant is criminally liable for the offenses the defendant specifically intends to aid or abet, or has knowledge of, as well as those crimes that are the natural and probable consequences of the offense he intends to aid or abet." *Robinson*, 475 Mich at 15. The defendant's state of mind may be inferred from all the facts and circumstances in evidence, including "a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime." *Carines*, 460 Mich at 758 (quotation omitted).

## C. ANALYSIS

As a preliminary matter, defendant does not dispute that the victim died as a result of multiple inflicted traumatic injuries, as well as physical, medical, and dental neglect. Defendant nevertheless argues that his conviction of felony murder cannot be sustained because he did not aid or abet Diaz in the abuse, torture, and killing of the victim. Defendant alleges that the evidence presented solely demonstrated his frustration with the victim's toilet-related accidents. Defendant specifically asserts that the text messages between himself and Diaz that were presented to the jury did not reveal that he had any hatred for the victim, or an intent to do great bodily harm to the victim as required to sustain a conviction of first-degree child abuse. Rather, defendant contends that the majority of the text messages showed violent tendencies from Diaz toward the victim, and that defendant was merely present. According to defendant, no evidence was presented indicating that defendant harmed the victim. Thus, defendant claims, he did not aid or abet or conspire in the abuse, torture, and murder of the victim.

Because defendant's felony murder conviction relies on whether defendant aided and abetted in the predicate felonies of first-degree child abuse and torture, resulting in the victim's death, it is first necessary to evaluate whether sufficient evidence existed to sustain defendant's convictions of first-degree child abuse and torture. We find that there was substantial evidence from which the jury could conclude that the victim was intentionally subjected to sustained abuse and torture from Diaz and defendant in the weeks preceding her death.

Contrary to defendant's assertion, defendant was not merely present while Diaz abused and tortured the victim. Rather, Facebook and text messages sent between Diaz and defendant indicated that defendant physically harmed the victim in a number of ways: defendant's own statements describe how he repeatedly struck the victim, frequently subjected her to cold baths, "shanked" her with a fork, forcefully scratched her back with his nails, hit her in the mouth, and gave her unprescribed Adderall despite the victim having demonstrated possible behavioral side

effects from the medication.[4] These messages revealed that defendant frequently discussed with Diaz his desire to subject the victim to more harm, stating that he would hurt the victim badly if she did not stop having toilet-related accidents, drown the victim in his urine if the victim accidentally urinated on him once more, and force the victim to eat her own excrement if she accidentally defecated in her room. In addition to the infliction of physical harm, defendant additionally discussed how he forced her to only wear a garbage bag, took away her pants, removed her bed and bedding, and kept her in a diaper after she had defecated in it.

A reasonable jury could find that defendant's messages to Diaz depicted defendant's active participation in the physical abuse and torture of the victim, or, at least, provided encouragement to Diaz's physical abuse and torture of the victim, as required to find defendant aided and abetted in the commission of first-degree child abuse and torture. See *Moore*, 470 Mich at 71. The jury could have inferred further that defendant assisted in the physical abuse and torture of the victim in light of his close association with Diaz as her romantic partner. See *Carines*, 460 Mich at 758 (a close association between the defendant and the principal is a factor in determining whether the defendant aided and abetted the principal in commission of a crime).

Furthermore, the autopsy report supported the inference that the physical abuse and torturous conduct described within these text messages and Facebook messages was actually perpetrated on the victim. The victim's body exhibited a spectrum of injuries—including bruising in varying stages of recovery, and at several locations on her body, indicative of having been slapped—strongly suggesting battered-child syndrome. The victim had second-degree scalding burns on a substantial portion of her body, all of which included signs of having been inflicted within 24 hours of the victim's death by dunking the victim in hot water, twice. There was indication of blunt force trauma to her scalp, and an area of her hair demonstrated signs of having been forcefully pulled out while the victim was alive. Additionally, her body demonstrated signs of having been suffocated by a hand over her mouth and nose, and—contrary to defendant and Diaz's claims that the victim was found submerged and drowned—nothing characteristic of a death by drowning was found in the autopsy.[5] All of the victim's injuries were classified as intentionally afflicted. Furthermore, defendant's DNA was present on the inside of several of the gloves recovered from the residence that had the victim's DNA on the outside and were found in the same container as bloody gauze.

Crucially, many of the text and Facebook messages between Diaz and defendant indicate that defendant was often the sole adult at home with the victim in the weeks before her death, and Diaz and defendant were the only adults present in the home on the morning of the victim's death.

---

[4] The record evidence does not explicitly state whether the victim was prescribed Adderall by a medical professional. However, based on the content of text and Facebook Messenger messages sent between defendant and Diaz, it can be inferred that the victim was not prescribed Adderall and was instead given Adderall from defendant's own prescription.

[5] The autopsy did, however, find "aspirated foreign body material (cellulose)" in the victim's lungs and trachea.

A reasonable jury could infer on the basis of the victim's injuries and the DNA findings that defendant inflicted cruel and extreme physical or mental pain or suffering, as well as serious physical harm, to the victim until her death, or that defendant aided and encouraged Diaz to do the same. See *People v Unger*, 278 Mich App 210, 224; 749 NW2d 272 (2008) ("Evidence of opportunity is logically relevant in a prosecution for murder."); see also *People v Dunigan*, 299 Mich App 579, 582; 831 NW2d 243 (2013) (citations omitted) ("[T]he elements of an offense may be established on the basis of circumstantial evidence and reasonable inferences from the evidence. It is the jury's duty to determine the weight to be accorded any inferences.")

Additionally, as the victim's live-in caregivers, Diaz and defendant were responsible for the victim's health and welfare.[6] Several aspects of the victim's declining health—her exceedingly low weight, matted and lice-ridden hair, and rotting teeth—would have been readily apparent to defendant. A number of the injuries inflicted on the victim were also outwardly visible in the weeks preceding the victim's death, as evidenced by the victim's schoolteachers' awareness of the bruise on the victim's cheek. Because physical, medical, and dental neglect were considered enumerated causes of the victim's death, a reasonable jury could have inferred that defendant's failure to address the health consequences of the victim's neglect, or the abuse perpetuated on her, constituted acting as a principal or aiding and abetting in the abuse. See *People v Portellos*, 298 Mich App 431, 444-445; 827 NW2d 725 (2012), overruled in part on other grounds by *People v Calloway*, 500 Mich 180, 187-188; 895 NW2d 165 (2017) (the defendant's failure to summon medical assistance despite awareness that medical assistance was necessary could support a conviction of first-degree child abuse).

For similar reasons, the evidence presented was sufficient for the jury to determine that defendant had the requisite intent to aid or abet the abuse and torture of the victim, or, in the alternative, had knowledge of Diaz's intent to commit the offenses. "The facts and circumstances of the killing may give rise to an inference of malice. A jury may infer malice from evidence that the defendant intentionally set in motion a force likely to cause death or great bodily harm." *Carines*, 460 Mich at 759 (citations omitted). In the text and Facebook messages presented to the jury, defendant and Diaz largely contextualized their infliction of injuries on the victim under the guise of punishing her for having toilet-related accidents in defendant's residence. Indeed, defendant repeatedly sent updates on the victim's toilet-related accidents to Diaz, consulted with Diaz on how to proceed with disciplining the victim after such accidents, expressed his extreme frustration with the victim's accidents to Diaz, and stated his intent to hurt the victim if she had future accidents. Diaz frequently responded to these texts with declarations that she would beat the victim, or by encouraging defendant to punish the victim in Diaz's absence.

---

[6] Even though defendant was not the victim's biological father, defendant was nonetheless a "person" under MCL 750.136b(2) for purposes of the CA-I conviction. A "person" for purposes of child abuse "means a child's parent or guardian or any other person who cares for, has custody of, or has authority over a child regardless of the length of time that a child is cared for, in the custody of, or subject to the authority of that person." MCL 750.136b(1)(d). Defendant cohabitated with the victim's mother and cared for the victim on a regular basis. Therefore, defendant was a "person" under MCL 750.136b(2) for purposes of the CA-I conviction.

The prosecution thus presented evidence that would allow the jury to infer defendant knew of the various abuses and torture perpetrated on the victim, because either he engaged in the abuse directly or knew of Diaz's conduct as part of their coordinated effort to discipline the victim for her behaviors. *Hardiman*, 466 Mich at 428, citing *People v McWilson*, 104 Mich App 550, 555; 305 NW2d 536 (1981) (the trier of fact may draw inferences from inferences, so long as "each inference is independently supported by established fact."). Because circumstantial evidence will suffice to establish defendant's state of mind, a reasonable juror could infer from these facts that defendant intended to create great bodily harm, or knew that the natural and probable consequence of the physical injuries and neglect inflicted on the victim included death or serious injury. *Kanaan*, 278 Mich App at 622; *Portellos*, 298 Mich App at 445-446.

There was also substantial evidence to suggest that defendant had a motive to abuse the victim. "Although motive is not an essential element of the crime, evidence of motive in a prosecution for murder is always relevant." *Unger*, 278 Mich App at 223 (citation omitted). "In cases in which the proofs are circumstantial, evidence of motive is particularly relevant." *Id.* (citation omitted). Defendant's messages to Diaz, and other individuals, evidence intense frustration with the victim and her toilet-related accidents, anger at having to care for the victim as well as his and Diaz's child, his belief that the victim was engaging in these behaviors purposefully to antagonize him, and his resentment of the victim generally. The prosecution thus presented sufficient evidence for the jury to determine that defendant intentionally participated in coordinating and perpetuating physical abuse in retaliation for the victim's toilet-related accidents, or had knowledge of Diaz's intent to physically abuse and neglect the victim.

Particular evidence presented to the jury also tended to establish defendant's consciousness of guilt. Defendant and Diaz did not immediately call 911 when the victim became unresponsive, but instead waited until the victim's maternal grandmother arrived 30 minutes later and prompted them to do so. Defendant repeatedly stated that the victim drowned in the bathtub and that he was covered in water when he attempted to administer CPR, but defendant was dry when the police arrived, no water was found in the victim's lungs, and the autopsy uncovered nothing that would signal a death by drowning. Defendant also claimed to be unaware of the origin of the victim's burn injuries, even though defendant's DNA was inside the gloves with the victim's DNA on the outside alongside bloody gauze, and the burns were inflicted in the preceding 24 hours. Furthermore, defendant's cellular telephone was factory reset, erasing its contents. "A jury may infer consciousness of guilt from evidence of lying or deception." *Unger*, 278 Mich App at 227. Additionally, after the victim's death, Diaz returned to the residence, packed belongings, and left with defendant. Diaz and defendant were later found in Lowndes County, Georgia, where they were extradited back to Michigan. While driving with an officer in Lowndes County, defendant stated that "all of this was just a misunderstanding, and that they were on their way back to Michigan to turn themselves in to the U.S. Marshal's Office." "[E]vidence of flight is admissible to support an inference of 'consciousness of guilt' and the term 'flight' includes such actions as fleeing the scene of the crime" and exiting the jurisdiction. *Id.* at 226 (citation omitted); see also *People v Coleman*, 210 Mich App 1, 4; 532 NW2d 885 (1995).

Taken together, there was more than sufficient evidence to support the jury's conclusion that defendant was a principal or aided and abetted Diaz in the abuse and torture of the victim, resulting in her death. Therefore, there was sufficient evidence to sustain defendant's conviction of felony murder.

## III. CONCLUSION

There was sufficient evidence for the jury to convict defendant of felony murder under an aiding or abetting theory and to affirm defendant's convictions and sentences.

Affirmed.

/s/ Christopher M. Murray
/s/ Amy Ronayne Krause
/s/ Jonathan Tukel