# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ARNOLD RASHARD HOWARD,

        Defendant-Appellant.

UNPUBLISHED
December 23, 2014

No. 317627
Oakland Circuit Court
LC No. 2012-240821-FC

---

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

SEMAJ DEANTHANY MORAN,

        Defendant-Appellant.

No. 318102
Oakland Circuit Court
LC No. 2012-240822-FC

---

Before: DONOFRIO, P.J., and FORT HOOD and SHAPIRO, JJ.

PER CURIAM.

    Defendants Arnold Rashard Howard and Semaj DeAnthany Moran were tried together before separate juries. Howard was convicted of second-degree murder, MCL 750.317, and first-degree home invasion, MCL 750.110a(2). Moran was convicted of two counts of first-degree premeditated murder, MCL 750.316(1)(a), two counts of first-degree felony murder, MCL 750.316(1)(b),[1] and four counts of possession of a firearm during the commission of a felony, MCL 750.227b. Both defendants appeal their respective convictions, and Howard also

---

[1] Moran was convicted of two counts of first-degree murder under two theories—felony murder and premeditated murder, but was sentenced only under the latter.

-1-

challenges the trial court's scoring of two sentencing guidelines offense variables.[2]  For the reasons set forth below, we affirm the trial court in all respects.

## I.  FACTS

This case arises from an incident involving a home invasion and shooting that took place on February 17, 2012, in Pontiac, Michigan.  Andrew Threlkeld testified that, on February 17, 2012, between approximately 8:00 p.m. and 8:30 p.m., he drove to a residence in Pontiac to visit his two longtime friends, Loretta Fournier and Luann Robinson.  The two women lived in separate apartments on the two floors of the residence, although the apartments shared a common entrance and front hall area.  When he arrived at the house, he noticed that the front door was cracked open.  He pushed the door open and immediately saw Robinson's body lying at the bottom of the stairs in the front hall, just inside the front door.  Approximately 10 feet away, Threlkeld observed Fournier's body lying in the front hall area.  He smelled what he believed to be gunsmoke in the air; fearing that an armed intruder was inside the house, he ran outside and drove to a nearby business, where he called 911.

Police officers who arrived at the scene testified that they found Fournier and Robinson dead; Fournier had suffered two gunshot wounds to her face and one to her back, while Robinson had suffered one gunshot wound to her head.  The officers also discovered a strike plate from the front door just inside the front hall and a baseball hat on the stairs leading up to Robinson's apartment.  In Robinson's apartment, a television was on the floor just in front of the stairs down to the front hall, with the power cord leading back into Robinson's bedroom, and a cable box was unscrewed from the wall in the bedroom.  After speaking with neighbors, police officers identified a person with the nickname "Hype" as a potential suspect for the shootings because he supplied marijuana to one or both of the victims.  Police officers used Fournier's cell phone to identify a phone number for "Hype," who was then identified as defendant Howard.  Officers traveled to Howard's home that night to speak with him.  When officers arrived at Howard's home, Howard's mother allowed the officers inside and informed them that Howard was in his bedroom.  After speaking with the officers inside the home, Howard was arrested.

Following his arrest, Howard was interviewed three separate times by police officers at a police station.

Jeff Buchmann of the Oakland County Sheriff's Department testified that the first interview was conducted on February 18, 2013 and that, at the outset, he informed Howard of his *Miranda*[3] rights and obtained a waiver of those rights.[4]  According to Buchmann, during this

---

[2] This Court consolidated defendants' appeals.  *People v Howard/Moran*, unpublished order of the Court of Appeals, entered October 8, 2014 (Dockets Nos. 317627 & 318102).

[3] *Miranda v Arizona*, 384 US 436; 86 S Ct 1602; 16 L Ed 2d 694 (1966).

[4] Neither a transcript nor other recording of this first interview has been provided to this Court.

interview, Howard claimed that he and Moran had gone to the residence of Fournier and Robinson for the purpose of smoking marijuana. Howard told Buchmann that while he was in the bathroom, he heard gunshots and when he exited the bathroom, he saw Fournier's body lying on the ground. He then stated that approximately 20 seconds later, he heard Robinson scream upstairs, heard more gunshots, and then heard Robinson's body tumble down the stairs.

The second interview, held the following day, February 19, 2013, was conducted after police recovered a purse containing identification belonging to one of the victims in the backyard of a residence near the scene of the crimes. Buchmann again conducted the interview and it is undisputed that he did not again read Howard his *Miranda* rights. During this brief interview, a transcript of which has been provided to this Court, Howard admitted to taking the purse and attempting to take the television that was found on the floor. However, he reiterated that he never had a gun on the night of the murders and that Moran had shot the two women.

Howard's third and final interview was conducted the following day, February 20, 2013.[5] Before this interview, Buchmann read Howard his *Miranda* rights. According to Buchmann, Howard admitted to forcing open the door to the apartment and acknowledged that the baseball hat found on the stairs belonged to him. During the interview, Howard provided a written statement that read:

> I was going to – was going to go smoke with [Fournier] as I do usually and my friend Semaj came along to ask [Fournier] about the fake money she gave Semaj when he sold her some weed. I told him he can ask her about the situation if he wanted to, but I never asked him to come or nothing else. He came and smoked, talked for a minute.

> I went to the bathroom. He shot [Fournier], but I never planned or made any part in the actions that took place. The most I did wrong was not calling the police and report what I saw, but other than that I didn't plan, plot or have any control over the actions that my friend made. I went to smoke with [Fournier], that's it.

> The lady upstairs was screaming. I pushed her down the stairs and Semaj said he couldn't leave any witnesses and he shot her.

Several days later, police returned to Howard's home with a search warrant and searched his room. Inside the pocket of Howard's coat, found in his bedroom closet, officers discovered multiple forms of identification belonging to the victims, including credit cards and insurance policies.

On February 19, 2013, Moran was interviewed by police at a substation of the Oakland County Sheriff's Department. Moran's mother traveled to the police station with him and gave

---

[5] Neither a transcript nor other recording of this third interview has been provided to this Court.

officers permission to speak with him.[6]  Prior to interviewing Moran, Buchmann read him his *Miranda* rights.  During the interview, Moran gave a written statement to Buchmann that read:

> Around 8:00 – I walked to [Fournier's] house on Pingree.  We sat at the table and we smoked.  Hype gave me the gun while [Fournier] was in her room getting the hookah – the hookah – the hookah bong.  And told me when you hear the toilet flush shoot.  I heard the toilet flush, but I hesitated to shoot.  I shot two shots and Hype ran up the stairs.  While he was upstairs I heard a lady screaming.  Then I heard multiple booms.  When I looked the lady was on the floor.  He told me to shoot her.  After I shot her I started crying and running.  While we were running I threw the gun behind a church/store.  Hype told me to swear on my grave I wouldn't tell.  I got home and told my grandma.  My mom came to get me.  We stayed at the hotel.  Then I left to Detroit with my aunt and mom.  We returned to go talk to the police."

Howard and Moran were each convicted by a jury as discussed above.  These appeals followed.

## II. *PEOPLE V HOWARD* (DOCKET NO. 317627)

Howard's sole argument as to the propriety of his convictions is his claim that the trial court erred in denying his motion to suppress his statements made in his second police interview on the grounds that he was not reissued *Miranda* warnings prior to that interview.[7]  Significantly, this is not a case were a defendant asserted his right to remain silent during a first interview and police later initiated a second interview without reissuing *Miranda* warnings.  Neither Howard nor the prosecution has referred us to any caselaw specifically addressing the factual situation before us.  We conclude that, even assuming a *Miranda* violation occurred with regard to Howard's second interview, he is not entitled to reversal given the ample evidence produced at trial of his guilt, independent of his statements in the second interview, as well as the relative insignificance of those challenged statements.

Howard does not claim error in the admission of his inculpatory statements made during his first and third interviews.  It was during those interviews that Howard admitted that he went to the victims' home with Moran, knew Moran was armed with a gun, went upstairs to "grab the tv" after Moran had shot one of the victims, and pushed the other victim down a flight of stairs.  The jury also heard evidence that the victims' identification and bank cards were found in Howard's coat located in his bedroom, that his hat was found at the crime scene, and that one of the residence's doors had been broken down.

---

[6] On February 19, 2013, Moran was 15 years old.

[7] We review a trial court's ruling at a suppression hearing for clear error.  *People v Aldrich*, 246 Mich App 101, 116; 631 NW2d 67 (2001).  "A finding is clearly erroneous if it leaves this Court with a definite and firm conviction that a mistake was made."  *People v Shipley*, 256 Mich App 367, 373; 662 NW2d 856 (2003).

Given this evidence and, in its light, the relative insignificance of Howard's admission during his second interview that he took a purse from the victims' home, we conclude that any error on the part of the trial court in admitting Howard's challenged statements was harmless. After reviewing the entire record, we are satisfied beyond a reasonable doubt that the admission of Howard's statements in his second interview did not contribute to his convictions. See *Arizona v Fulminante*, 499 US 279, 296; 111 S Ct 1246; 113 L Ed 2d 302 (1991) ("it must be determined whether the State has met its burden of demonstrating that the admission of the confession to [law enforcement] did not contribute to [the defendant]'s conviction."); *Chapman v California*, 386 US 18, 24; 87 S Ct 824; 17 L Ed 2d 705 (1967) (holding that harmless-error analysis applies to asserted constitutional error); *People v Grevious*, 119 Mich App 403, 408; 327 NW2d 72 (1982) ("If there is overwhelming evidence against defendant, erroneous admission of statements obtained in violation of *Miranda* can fairly be characterized as harmless beyond a reasonable doubt."); *People v Howard*, 226 Mich App 528, 542; 575 NW2d 16 (1997) ("even if defendant's confession had not been voluntarily and knowingly and intelligently made . . . its admission at trial would be subject to a harmless error analysis, much like the erroneous admission of any other evidence.").

Howard next argues that the trial court erred in scoring Offense Variables (OVs) 5 and 10 at sentencing. Specifically, Howard argues that the trial court should have assessed zero points for OVs 5 and 10 and that he was denied the effective assistance of counsel when his counsel failed to object to the trial court's scoring of these OVs.[8]

OV 5, MCL 777.35, concerns psychological injury to a member of a victim's family. Under OV 5, 15 points must be assessed where "serious psychological injury requiring professional treatment occurred to a victim's family." MCL 777.35(1)(a). Whether a family member of the victim has actually sought professional treatment is not determinative. *People v Portellos*, 298 Mich App 431, 449; 827 NW2d 725 (2012). Rather, 15 points must be assessed "if the serious psychological injury to the victim's family may require professional treatment." MCL 777.35(2).

Howard argues that there was no evidence to suggest that a member of Robinson's family suffered serious psychological injury requiring professional treatment. Because Howard did not object to the scoring of OV 5 at sentencing, the trial court did not articulate its rationale for scoring the variable at 15 points. However, in Howard's Presentence Investigation Report (PSIR), Thomas Robinson, the victim's brother, stated that "the death of his sister has absolutely had a serious traumatic effect" on him. Thomas also stated that "he has remained grief stricken" and that "he has not enrolled in any form of counseling, preferring to deal with the matter on his

---

[8] "Under the sentencing guidelines, the circuit court's factual determinations are reviewed for clear error and must be supported by a preponderance of the evidence." *People v Hardy*, 494 Mich 430, 438; 835 NW2d 340 (2013). "Whether the facts, as found, are adequate to satisfy the scoring conditions prescribed by the statute, i.e., the application of the facts to the law, is a question of statutory interpretation, which an appellate court reviews de novo." *Id*.

own and his religious affiliations." At sentencing, Thomas stated that "[t]his act of violence that they performed has changed my walk in life." Thomas also stated:

> Her life was cut short and certainly didn't deserve it. I'm very hurt and mad at the same time. It's not a very stable combination for me to carry around. I'm hurt because she was the only sibling I had left in this state and now I'm alone. I'm mad at how and why she was put down. I'm mad because I didn't get the chance to say goodbye or tell her that I love her one more time.

Although Thomas stated that he has not sought professional counseling, after a review of the record, we conclude that the trial court's scoring of OV 5 at 15 points was not error. Thomas stated that he was stricken with grief and that his combination of pain and anger is "not a very stable combination." Based on Thomas's statement, it was not error for the trial court to assess 15 points for OV 5, because Thomas suffered severe psychological injury resulting from the murder of his sister.

We also find no error in the scoring of OV 10, which concerns the exploitation of a vulnerable victim. Under OV 10, 10 points must be assessed where "[t]he offender exploited a victim's physical disability, mental disability, or youth or agedness, or a domestic relationship, or the offender abused his or her authority status." MCL 777.40(1)(b). Our Supreme Court has held that "points should be assessed under OV 10 only when it is readily apparent that a victim was 'vulnerable,' i.e., was susceptible to injury, physical restraint, persuasion, or temptation." *People v Cannon*, 481 Mich 152, 158; 749 NW2d 257 (2008). In considering whether a victim was vulnerable, relevant factors are:

> (1) the victim's physical disability, (2) the victim's mental disability, (3) the victim's youth or agedness, (4) the existence of a domestic relationship, (5) whether the offender abused his or her authority status, (6) whether the offender exploited a victim by his or her difference in size or strength or both, (7) whether the victim was intoxicated or under the influence of drugs, or (8) whether the victim was asleep or unconscious. [*Id.* at 158-159.]

The existence of one of the factors "does not automatically render the victim vulnerable." *Id.* at 159. "Exploit" means "to manipulate a victim for selfish or unethical purposes." MCL 777.40(3)(b).

Because Howard failed to object to the scoring of OV 10 at sentencing, the trial court did not articulate its rationale for the score. However, at the time of her murder, Robinson was 58 years old and Howard was 22 years old. Using his apparent superior strength, Howard, by his own admission, broke into Robinson's apartment and forcibly threw her down the stairs so that Moran could shoot her. Accordingly, Howard exploited Robinson's vulnerabilities relating to her age and inferior strength so that the witness to Fournier's murder would be eliminated as well as to facilitate the theft of items from her apartment. Accordingly, the trial court did not err by scoring OV 10 at 10 points.

Finally, Howard argues that his counsel was ineffective failing to raise these objections to the scoring of OVs 5 and 10.[9]  Because the trial court did not err by scoring OV 5 at 15 points and OV 10 at 10 points, any objection by Howard's trial counsel would have been futile, and counsel is not ineffective for failing to raise meritless or futile objections.  *People v Eisen*, 296 Mich App 326, 329; 820 NW2d 229 (2012).  Moreover, Howard cannot establish that he was prejudiced by counsel's failure to object because, even if the trial court had scored OVs 5 and 10 at zero points, it would not have altered Howard's applicable sentencing guidelines range.  *People v Swain*, 288 Mich App 609, 643; 794 NW2d 92 (2010).  Accordingly, Howard is not entitled to relief on his claim of ineffective assistance of counsel.

## III.  *PEOPLE V MORAN* (DOCKET NO. 318102)

Defendant Moran, who was 15 years old at the time of the crimes, argues that the trial court erred in denying his motion to suppress his statements made in his police interview on the grounds that the statements were made involuntarily.  He contends that officers failed to ensure that he understood his *Miranda* rights prior to questioning him and that his mother was absent from the room when he was interviewed by police.

In determining whether a juvenile's inculpatory statement to police was made voluntarily, this Court considers the totality of the circumstances through the lens of unique factors.  *People v Givans*, 227 Mich App 113, 121; 575 NW2d 84 (1997).  Those factors include:

> (1) whether the requirements of *Miranda* have been met and the defendant clearly understands and waives those rights, (2) the degree of police compliance with MCL 764.27 . . . and the juvenile court rules, (3) the presence of an adult parent, custodian, or guardian, (4) the juvenile defendant's personal background, (5) the accused's age, education, and intelligence level, (6) the extent of the defendant's prior experience with the police, (7) the length of detention before the statement was made, (8) the repeated and prolonged nature of the questioning, and (9) whether the accused was injured, intoxicated, in ill health, physically abused or threatened with abuse, or deprived of food, sleep, or medical attention.  [*Id.*]

In this case, the officers complied with *Miranda* prior to interviewing Moran.  It is uncontested that before officers questioned Moran, they informed him of his *Miranda* rights and he signed a form indicating that he wanted to waive those rights.  Moran contends that "the investigative detectives did not make certain that the fifteen year old understood that he did not have to speak with them."  However, we have listened to the taped interview in its entirety and Moran's contention that the officers failed to comply with *Miranda* is unsupported by the record.

---

[9] "Whether a person has been denied effective assistance of counsel is a mixed question of fact and constitutional law."  *People v LeBlanc*, 465 Mich 575, 579; 640 NW2d 246 (2002).  "Findings on questions of fact are reviewed for clear error, while rulings on questions of constitutional law are reviewed de novo."  *People v Jordan*, 275 Mich App 659, 667; 739 NW2d 706 (2007).

Moreover, they spoke with him outside his mother's presence only after receiving her permission to do so.

Moran's contention that he was subjected to repeated and prolonged questioning is similarly inconsistent with the record. At the time of questioning, Moran was 15 years old, attended school, and indicated that he was not intoxicated or under the influence of any substance. He appeared to understand all of Buchmann's questions. He was not deprived of food, sleep, or medical attention, and there was no contention that he was threatened or abused in any way. In spite of the absence of Moran's mother during question, under the totality of the circumstances, we conclude that Moran's statements to the officers were made freely and voluntarily. Accordingly, the trial court's denial of Moran's motion to suppress his statements was supported by the record and not erroneous.

Affirmed.

/s/ Pat M. Donofrio
/s/ Karen Fort Hood
/s/ Douglas B. Shapiro