*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

        Plaintiff-Appellee,

v

ARNDOLA CHARLES LEWIS,

        Defendant-Appellant.

UNPUBLISHED
December 3, 2019

No. 342461
Wayne Circuit Court
LC No. 17-001662-01-FC

Before: CAMERON, P.J., and CAVANAGH and SHAPIRO, JJ.

PER CURIAM.

A jury convicted defendant, Arndola Charles Lewis, of second-degree murder, MCL 750.317, felon in possession of a firearm (felon-in-possession), MCL 750.224f, and committing a felony while possessing a firearm (felony-firearm), MCL 750.227b. The trial court sentenced Lewis as a fourth-offense habitual offender, MCL 769.12, to 45 to 65 years' imprisonment for the second-degree murder conviction, 5 to 15 years' imprisonment for the felon-in-possession conviction, and 5 years' imprisonment for the felony-firearm conviction.[1] Lewis appeals his convictions and sentences. We affirm Lewis's convictions but vacate his sentences and remand for resentencing.

## I. FACTS AND PROCEDURAL BACKGROUND

This matter arises from the murder of the victim, who was shot in the back of the head on January 29, 2017. The victim and Lewis were alone in an apartment that Lewis shared with his girlfriend at the time the victim was shot.

When Lewis's girlfriend returned home on the afternoon of January 29, 2017, she saw the victim on the floor of the apartment with blood near his head. Lewis's girlfriend recognized the

---

[1] The second-degree murder and felon-in-possession sentences are concurrent to each other, and they are consecutive to the felony-firearm sentence.

victim because the victim purchased "norcos"[2] from her about once each month. According to Lewis's girlfriend, as of January 29, 2017, the victim owed her $30 for past pill purchases. Lewis told her to call 911, and she complied.

Law enforcement was dispatched to the apartment complex where Lewis and his girlfriend resided. Officer Christopher Hayes made contact with Lewis, who was standing outside of the apartment. Lewis told Officer Hayes "He attacked me so I shot him." Lewis did not have any visible injuries, and he did not claim to be injured. Officer Hayes entered the apartment and located the victim, who was face down in a puddle of blood. A semiautomatic handgun was located near the victim's feet. Lewis was taken into custody. During interviews with law enforcement, Lewis repeatedly indicated that he shot the victim in self-defense after the two began to physically fight. However, Lewis provided inconsistent statements concerning whether Lewis or the victim owned the handgun in question and who initially pulled out the handgun during the fight.

An autopsy was performed, and it was determined that the victim died from a gunshot wound to the back of the head. Physical evidence revealed that the bullet entered at the back left side of the victim's head and exited through his right temple. The gunshot wound was determined to be a contact wound, and the victim's death was ruled a homicide. Lewis was charged with first-degree murder, MCL 750.316(1)(a), felon-in-possession, and felony-firearm.

At trial, Lewis testified in his own defense. According to Lewis, the victim entered his apartment on the day in question and proceeded uninvited to the apartment's game room. When Lewis asked the victim to leave, the victim refused and Lewis and the victim began to physically fight. Lewis testified that he was "no match" for the victim given the victim's size.[3] At some point, Lewis retrieved a handgun that was located behind a couch in the game room. Lewis pointed the gun at the victim and told the victim to leave. According to Lewis, the victim grabbed the gun, and the two men began wrestling. At one point during the struggle, the gun was pointed in the victim's direction and the two men were facing each other. Lewis was unsure if at any point the gun came above the victim's shoulder, but he recalled that the victim turned his head away from the handgun during the struggle. At some point, the gun discharged and the victim fell toward Lewis. Lewis was unable to explain how the victim was shot in the back of the head if he and the victim were standing face-to-face at the time the gun discharged. Lewis also admitted that he lied to the police about the victim having a gun when he entered the apartment.

---

[2] "Norco" contains a combination of acetaminophen and hydrocodone. "Hydrocodone is an opioid pain medication. Acetaminophen is a less potent pain reliever that increases the effects of hydrocodone." <https://www.drugs.com/norco.html> (accessed October 31, 2019.)

[3] The victim was 5'8" and weighed over 200 pounds. Lewis was 5'5" and weighed about 130 pounds.

The jury convicted Lewis of the lesser included offense of second-degree murder, felon-in-possession, and felony-firearm. Lewis was sentenced to a term of imprisonment, and this appeal followed.

## II. CONFRONTATION CLAUSE

Lewis first argues that his Sixth Amendment right of confrontation was violated when the trial court permitted the introduction of Dr. Leonardo Roquero's autopsy report and findings through the testimony of Dr. Carl Schmidt, who did not perform the autopsy on the victim.

At trial, Dr. Schmidt testified that he was a forensic pathologist employed by the Wayne County Medical Examiner's Office. Dr. Schmidt noted that he had been appointed as the Chief Medical Examiner, and he described his job responsibilities and experience as a medical examiner. The parties stipulated to classifying Dr. Schmidt's qualifications as an expert in the area of forensic pathology. Dr. Schmidt then explained that the victim's autopsy was performed by Dr. Roquero, who no longer worked for the Wayne County Medical Examiner's Office. Dr. Schmidt agreed that he did not personally conduct the autopsy or view the victim's body. However, he noted that he had reviewed the autopsy report, as well as photographs and diagrams that were created during the autopsy. Dr. Schmidt agreed with Dr. Roquero's findings.

Dr. Schmidt testified that the manner of the victim's death was homicide and that the cause of death was a gunshot wound to the head. Dr. Schmidt described in some detail the gunshot wound sustained by the victim, explaining the location of the wound and the path the bullet took through the victim's head. Dr. Schmidt testified that the bullet entered at the back of the victim's head and exited through the right temple. Dr. Schmidt described the path of the bullet as being from "back to front, and left to right. And slightly upward, too." Dr. Schmidt noted that a distinctive feature of the wound was that it was a contact wound, which he indicated "means that the muzzle of the gun was actually in contact with the skin when the gun was fired."

The Sixth Amendment of the United States guarantees to a criminal defendant the "right . . . to be confronted with the witnesses against him." US Const, Am VI; *Crawford v Washington*, 541 US 36, 42; 124 S Ct 1354; 158 L Ed 2d 177 (2004). The *Crawford* Court held that the Confrontation Clause does not permit the admission of out-of-court statements when the statements are "testimonial" unless the defendant has had a prior opportunity for cross-examination and the declarant is unavailable to testify. *Id*. at 59.

There is no dispute that under Michigan law Dr. Roquero's autopsy report is a testimonial statement protected by the Confrontation Clause and that Lewis would have had the right to examine Dr. Roquero as the author of the report. See *People v Lewis*, 490 Mich 921; 806 NW2d 295 (2011). However, when the prosecutor moved to admit the autopsy report into evidence at the beginning of Dr. Schmidt's testimony at trial, defense stated "[w]ithout objection."

Our Supreme Court has recognized the difference between the concepts of forfeiture and waiver. A waiver is the intentional and voluntary relinquishment of a known right, while forfeiture is the failure to assert a right in a timely fashion. See *People v Carter*, 462 Mich 206, 215-216; 612 NW2d 144 (2000). "When defense counsel clearly expresses satisfaction with a trial court's decision, counsel's action will be deemed to constitute a waiver." *People v*

*Kowalski*, 489 Mich 488, 503; 803 NW2d 200 (2011).  We conclude that, in this case, by stating "without objection," defense counsel communicated to the trial court that she did not object to the admission of the autopsy report into evidence and thereby voluntarily and intentionally relinquished the right to contest its admission into evidence.  See *id.* at 505 (holding that an issue was waived—as opposed to merely forfeited—as a result of counsel's express indication that she did not object to the jury instructions provided by the trial court).  See also *People v Buie*, 491 Mich 294, 316-317; 817 NW2d 33 (2012) (holding that defense counsel's statement that she would "leave that to the court's discretion" waived any arguments relating to the defendant's right of confrontation).  Therefore, defense counsel's decision to acquiesce to the admission to the autopsy report waived Lewis's right to confrontation.

Indeed, in *Melendez-Diaz v Massachusetts*, the United States Supreme Court acknowledged that "[t]he right to confrontation may, of course, be waived, including by failure to object to the offending evidence; and States may adopt procedural rules governing the exercise of such objections."  *Melendez-Diaz v Massachusetts*, 557 US 305, 313 n 3; 129 S Ct 2527; 174 L Ed 2d 314 (2009).  Our Supreme Court in *Buie*, 491 Mich at 297, considered whether a defendant waived his right of confrontation by not objecting to the admissibility of witness testimony taken by interactive video.  The *Buie* Court stated, "There is no doubt that the right of confrontation may be waived and that waiver may be accomplished by counsel."  *Id*. at 307.  The *Buie* Court further observed that most courts that have considered the issue "have concluded that the right of confrontation may be waived, and that the waiver may be effected by counsel, as long as counsel's decision constitutes reasonable trial strategy and the defendant does not object to the waiver."  *Id*. at 310.  It is strongly presumed that trial counsel exercises sound trial strategy.  *Id*. at 311 ("[A] defendant must overcome the strong presumption that his counsel's action constituted sound trial strategy under the circumstances.").

By acquiescing to the admission of the autopsy report, defense counsel relieved the prosecutor from calling Dr. Roquero as a witness to authenticate the report.  Additionally, there is no indication in the record that it would have been impossible for the prosecutor to take additional steps to secure Dr. Roquero's appearance at trial or that the autopsy report would not have been admitted into evidence if Dr. Roquero had been called as a witness.  It is plausible that defense counsel believed that the unfavorable finding in the autopsy report, i.e., that the victim was shot in the back of the head and that the wound was a contact wound, was not reasonably subject to challenge.[4]  Therefore, there would have been no advantage to defense counsel requiring Dr. Roquero to testify.  In fact, defense counsel could have reasonably determined that Dr. Roquero's testimony would only result in the jury giving more weight to the autopsy report.  Further, by not requiring the prosecutor to call Dr. Roquero as witness, defense counsel was able

---

[4] Defense counsel obtained an order from the trial court allowing for an independent forensic pathologist to review the autopsy report and all of the data on which it was based, including photographs, diagrams, x-rays, and any other records possessed by the Wayne County Medical Examiner's Office regarding the victim's autopsy.  Defense counsel also gave notice that the independent forensic pathologist may be called as a defense expert.  However, defense counsel did not present the testimony of such an expert at trial.

to emphasize on cross-examination that Dr. Schmidt did not view the victim's body or perform the autopsy. As a result of defense counsel's questions, Dr. Schmidt acknowledged that his opinions were based on "another doctor's report." This allowed defense counsel to call into question Dr. Schmidt's testimony concerning the bullet wound. Consequently, the defense was able to portray an air of confidence before the jury while simultaneously minimizing the impact of the adverse findings in Dr. Roquero's written report. Therefore, we cannot say that defense counsel's decision to acquiesce to the admission of the autopsy report was unreasonable.

Moreover, at no point did Lewis object on the record or otherwise indicate his disagreement with defense counsel's decision to acquiesce to the admission of the autopsy report into evidence. Even if Lewis had privately expressed dissatisfaction off the record, this would not have been sufficient to prevent or override counsel's waiver of Lewis's right to confrontation. Rather, to prevent counsel from waiving a defendant's right of confrontation, "any objection a defendant may have must be made on the record." *Buie*, 491 Mich at 311. As our Supreme Court explained in *Buie*, *id.* at 313:

> [A]llowing a defendant to object to defense counsel's consent off the record provides a defendant with "an appellate parachute." Under such a rule, a defendant might acquiesce in or even expressly agree with defense counsel's waiver outside of court and then claim to have objected behind closed doors, or even in his own mind, when he does not enjoy the outcome he desires.

In sum, defense counsel's decision to acquiesce to the admission of the autopsy report was strategic and Lewis did not object on the record. Therefore, we conclude that Lewis, through the actions of counsel, waived his Sixth Amendment right to confrontation as it related to the autopsy report. Lewis is therefore not entitled to relief in relation to this argument. See *Carter*, 462 Mich at 216 (holding that waiver extinguishes the right to appeal an alleged error). Because Lewis has waived any arguments concerning the admission of the autopsy report into evidence, he cannot challenge Dr. Schmidt's testimony concerning the contents of the autopsy report. See *People v Fackelman*, 489 Mich 515, 534; 802 NW2d 552 (2011) (holding that MRE 702 "permits 'an expert's opinion only if that opinion is based exclusively on evidence that has been introduced into evidence in some way other than through the expert's hearsay testimony.' ").

A defendant who waives his or her Sixth Amendment right to confrontation through the actions of counsel may still seek relief by establishing that his or her counsel rendered constitutionally ineffective assistance. See *Buie*, 491 Mich at 315 n 13. Lewis failed to raise an ineffective assistance of counsel claim in the trial court in connection with a motion for a new trial, and this Court denied Lewis's motion to remand for a *Ginther*[5] hearing. Therefore, our review of this issue is limited to mistakes apparent on the record. *People v Heft*, 299 Mich App 69, 80; 829 NW2d 266 (2012). "To demonstrate ineffective assistance of counsel, a defendant must show that his or her attorney's performance fell below an objective standard of reasonableness under prevailing professional norms and that this performance caused him or her

---

[5] *People v Ginther*, 390 Mich 436; 212 NW2d 922 (1973).

prejudice." *People v Nix*, 301 Mich App 195, 207; 836 NW2d 224 (2013). "To demonstrate prejudice, a defendant must show the probability that, but for counsel's errors, the result of the proceedings would have been different." *Id*.

In this case, defense counsel was not ineffective. As already discussed, defense counsel's acquiescence relieved Dr. Roquero from testifying before the jury about the findings in his written report. Because Dr. Roquero did not testify, defense counsel was able to point out that Dr. Schmidt did not view the victim's body and did not perform the autopsy. By deciding to acquiesce to the admission of Dr. Roquero's report, defense counsel was able to attack the reliability of Dr. Schmidt's testimony. Counsel's decision to not require the testimony of Dr. Roquero was therefore reasonable trial strategy, and Lewis has failed to overcome the presumption that counsel's failure to object to the admission of the autopsy report fell below an objective standard of reasonableness under prevailing professional norms. See *People v McFarlane*, 325 Mich App 507, 528; 926 NW2d 339 (2018) (holding that ineffective assistance of counsel does not exist where defense counsel did not object to damaging evidence, but "there was a plausible and legitimate strategic reason for defense counsel's decision not to object").

### III. EVIDENCE REGARDING THE VICTIM

Lewis next argues that he was denied a fair trial because information concerning the victim was admitted through the testimony of the victim's brother, which Lewis claims was irrelevant and elicited sympathy for the victim.

Because Lewis did not object below to the challenged testimony, we apply the plain-error rule, which requires that "1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999). An error has affected a defendant's substantial rights when there is "a showing of prejudice, i.e., that the error affected the outcome of the lower court proceedings." *Id*. Moreover, "once a defendant satisfies these three requirements, . . . [r]eversal is warranted only when the plain, forfeited error resulted in the conviction of an actually innocent defendant or when an error seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings' independent of the defendant's innocence." *Id*. at 763-764 (quotation marks and citation omitted). A defendant bears the burden of persuasion with respect to prejudice. *Id*. at 763.

At trial, the victim's brother testified that he was the victim's older brother. The victim's brother further testified that at the time he was murdered, the victim was employed at a gas station, he was married, and had an infant son. The victim's brother identified a photograph of the victim with his son and testified that he identified the victim's body at the Wayne County Medical Examiner's Office on January 30, 2017. The victim's brother said "no" when asked if he knew the victim to use drugs.

"Generally, all relevant evidence is admissible, unless otherwise provided by law, and evidence that is not relevant is not admissible." *People v Fletcher*, 260 Mich App 531, 553; 679 NW2d 127 (2004). " 'Relevant evidence' means evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." MRE 401. Although evidence may be

relevant, it "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." MRE 403.

The brief testimony of the victim's brother regarding the victim's personal history, i.e., that the victim was married, had a young child, and was employed at the time of his death, was relevant because it provided basic background information as an aid to the jury's understanding of the case. 1 Robinson & Longhofer, Michigan Court Rules Practice, Evidence, § 401.2, p 227. Given that a victim cannot be separated from a crime, proving the facts of murder necessarily involves disclosure as to the victim's background. Additionally, the victim's background information and evidence that the victim's brother identified the victim's body at the Medical Examiner's Office establishes that the victim was a living person, which is an element of murder. See *People v Oros*, 502 Mich 229, 240; 917 NW2d 559 (2018). See also *People v Simmons*, 134 Mich App 779, 785; 352 NW2d 275 (1984). Evidence that the victim's brother identified the victim's body is also relevant because it forms a link in a chain of the evidence leading to the conclusion that the body that the victim's brother identified is also the body on which Dr. Roquero performed an autopsy. Therefore, the testimony of the victim's brother made an element of murder—that the victim died—more likely to be true. Given that the evidence tended to establish an element of murder, the evidence cannot be considered " 'marginally probative evidence' and, thus, cannot possibly be considered unfairly prejudicial." See *People v Blackston*, 481 Mich 451, 483; 751 NW2d 408 (2008) (citation omitted). Consequently, because the evidence was relevant and did not violate MRE 403, Lewis cannot establish plain error.

Moreover, even if the now-challenged evidence was determined to constitute plain error, the error did not affect Lewis's substantial rights because the testimony was not excessive and was not presented in such a manner as to cause the jury to believe that it was material to Lewis's guilt. See *People v Dixon-Bey*, 321 Mich App 490, 514; 909 NW2d 458 (2017) (holding that it is not likely that the jury will give undue weight to one brief portion of a single witness's testimony during a lengthy trial). Additionally, the jury was instructed both at the beginning and end of trial that they were to decide the case based upon the evidence and not upon bias, sympathy, and emotion. Jurors are presumed to follow their instructions. See *People v Graves*, 458 Mich 476, 486; 581 NW2d 229 (1998) ("It is well established that jurors are presumed to follow their instructions."). Consequently, Lewis has failed to establish plain error affecting his substantial rights. See *Carines*, 460 Mich at 763.

With respect to the introduction of the photograph of the victim and his son, it appears that the prosecutor introduced the photograph to show the jury what the victim looked like before he died. See 1 Robinson & Longhofer, Michigan Court Rules Practice, Evidence, § 401.2, p 227. The brother's testimony regarding the photograph confirmed the identity of the victim in this case. Further, when arguing that Lewis shot the victim in self-defense, defense counsel made specific arguments regarding the victim's size relative to that of Lewis. Thus, testimony regarding the victim's physical characteristics was relevant. Given that the evidence was relevant to provide the jury with background information necessary to identify the victim, and to rebut Lewis's argument that he acted in self-defense, the evidence cannot be considered "marginally probative evidence" and therefore cannot be considered unfairly prejudicial. See *Blackston*, 481 Mich at 483. Consequently, because the photograph and the victim's brother's

-7-

identification of the victim in the photograph was relevant, its admission did not constitute plain error.

With respect to Lewis's argument that he was denied a fair trial because the victim's brother testified that he did not know that the victim used drugs, we fail to see how this evidence affected Lewis's substantial rights. More specifically, evidence at trial established that the victim purchased "norcos" from Lewis's girlfriend about once a month and that toxicology tests established that the victim had hydrocodone byproducts and THC from marijuana in his system when he died. The prosecutor never disputed at trial that the victim consumed illegal drugs. Consequently, evidence that the victim's brother did not know that the victim ingested drugs only served to undercut his credibility. Thus, Lewis cannot establish that his substantial rights were affected with respect to this evidence.

Lewis further contends that defense counsel was ineffective when she failed to challenge the testimony of the victim's brother. However, as already stated above, the evidence was admissible. Therefore, counsel's failure to make a meritless objection did not constitute ineffective assistance of counsel. *People v Unger*, 278 Mich App 210, 256; 749 NW2d 272 (2008) ("Defense counsel was not ineffective for failing to make a futile objection.").

## IV. MANSLAUGHTER INSTRUCTION

Lewis next claims that defense counsel was ineffective because she failed to request a jury instruction on manslaughter as a lesser included offense of murder and objected to the prosecutor's request for the same. Lewis failed to raise an ineffective assistance of counsel claim in the trial court in connection with a motion for a new trial and this Court denied Lewis's motion to remand for a *Ginther* hearing. Therefore, our review of this issue is limited to mistakes apparent on the record. *Heft*, 299 Mich App at 80.

The record establishes that defense counsel, with Lewis's consent, was acting pursuant to an all-or-nothing trial strategy by objecting to a manslaughter instruction. During pretrial proceedings in this case, Lewis rejected an unofficial plea offer of second-degree murder and felony-firearm, second offense, with sentence caps of 20 years in prison and 5 years in prison, respectively.[6] The record also shows that defense counsel discussed with Lewis that, even if he was convicted of the lesser offense of second-degree murder or manslaughter, Lewis would

---

[6] In exchange for Lewis pleading guilty to second-degree murder and felony-firearm, the prosecutor offered to dismiss the felon-in-possession charge and the habitual offender notice. The prosecutor agreed to a "sentence agreement" of 23 to 50 years' imprisonment on the second-degree murder conviction and five years' imprisonment on the felony-firearm conviction, which would be served consecutively to the second-degree murder conviction. Lewis rejected this offer. After further negotiations, the prosecutor indicated that he would consider offering "20 and 5 years, respectively." Defense counsel indicated that the prosecutor's offer was not "an official offer," and Lewis acknowledged on the record that he did not wish to entertain the unofficial offer.

receive, at a minimum, a mandatory 25-year sentence, MCL 769.12(1)(a), consecutive to a sentence of 5 years' imprisonment for a felony-firearm conviction.

After Lewis testified at trial, the prosecution requested that the jury be instructed on the lesser included offense of manslaughter because Lewis's testimony supported the instruction. Defense counsel objected because Lewis's theory of the case was that he acted rationally in fear of his life, not emotionally or irrationally. Defense counsel also stated that Lewis was pursuing an all-or-nothing trial strategy of self-defense, which was that Lewis had "made a choice to defend [him]self. And he want[ed] all of his eggs in one basket." Defense counsel also clearly stated that she wanted to preclude the prosecutor from suggesting in closing arguments that the altercation Lewis described made him so angry that he shot the victim "in the back of the head." Lewis was present when defense counsel made these statements on the record, and he never represented that he disagreed with defense counsel.

This Court has held that declining to request a particular jury instruction can constitute effective trial strategy. *People v Dunigan*, 299 Mich App 579, 584; 831 NW2d 243 (2013). Indeed, deciding what instructions to request falls within the wide range of discretion accorded to counsel and a defendant must overcome the presumption that counsel's actions were reasonable strategy. *Id*. Furthermore, this Court has specifically recognized that an all-or-nothing defense is a legitimate trial strategy. *People v Nickson*, 120 Mich App 681, 687; 327 NW2d 333 (1982). When the defense trial strategy is to obtain an outright acquittal, an instruction or argument on a lesser offense may reduce the defendant's chances of acquittal. *People v Robinson*, 154 Mich App 92, 94; 397 NW2d 229 (1986). This may be a reasonable strategy where "[d]efense counsel may have correctly assumed that the minimum sentence for the offense charged, if defendant should be convicted of it, would be no more than the probable minimum sentence for a conviction of a lesser included offense." *Id*.

In this case, defense counsel recognized that Lewis would still face a mandatory minimum sentence of 25 years' imprisonment under MCL 769.12(1)(a), regardless of whether Lewis was convicted of second-degree murder or manslaughter. The crime of manslaughter, MCL 750.321, is a "serious crime," MCL 769.12(6)(c), and the information listed more than three listed prior felonies, MCL 769.12(6)(a). Moreover, with Lewis's testimony that he and the victim fought coupled with the evidence that the victim was shot in the back of the head, defense counsel likely desired to preclude the prosecutor from giving the jury the choice between convicting Lewis of murder or manslaughter.

In sum, the record supports that defense counsel was pursuing a reasonable all-or-nothing trial strategy when she objected to instructing the jury on manslaughter. Whether counsel's trial strategy was succesful does not render counsel's performance ineffective, nor does it overcome the presumption that counsel provided reasonable professional assistance.[7] *People v Petri*, 279

---

[7] Lewis impermissibly attempts to expand the record on appeal by attaching his own affidavit to his appellate brief. MCR 7.210(A)(1). In the affidavit, Lewis avers that he would have wanted the manslaughter instruction if he had known that he "could be convicted of second-degree murder." Because Lewis's affidavit is not part of the lower court record, it need not be

Mich App 407, 412; 760 NW2d 882 (2008). This Court will not assess counsel's competence with the benefit of hindsight. *Dunigan*, 299 Mich App at 590; *Unger*, 278 Mich App at 242-243.

## V. SENTENCING ERRORS

### A. OFFENSE VARIABLE 3

Lewis next argues that he is entitled to resentencing because the trial court incorrectly assessed 50 points for Offense Variable (OV) 3, MCL 777.33 (physical injury to victim). The prosecutor agrees and so do we.

This Court reviews for clear error the trial court's factual determinations at sentencing and "review[s] de novo whether the factual determinations were sufficient to assess points under OV [3]." *People v Schrauben*, 314 Mich App 181, 196; 886 NW2d 173 (2016). "When calculating the sentencing guidelines scores, a trial court may consider all evidence in the record, including but not limited to the presentence investigation report (PSIR) and admissions made by a defendant during a plea proceeding." *People v Jackson*, 320 Mich App 514, 519; 907 NW2d 865 (2017), rev'd on other grounds 504 Mich 929; 930 NW2d 388 (2019).

OV 3 relates to physical injury to the victim. A trial court shall assess 50 points for OV 3 when the victim's "death results from the commission of a crime and the offense or attempted offense involves the operation of a vehicle[.]" MCL 777.33(2)(c). In this case, the trial court erred by assessing 50 points for OV 3 because the victim's death did not result from an offense involving Lewis's unlawful operation of a motor vehicle. See MCL 777.33(2)(c); *People v Portellos*, 298 Mich App 431, 446; 827 NW2d 725 (2012), overruled on other grounds by *People v Calloway*, 500 Mich 180, 188; 895 NW2d 165 (2017). The trial court should have scored OV 3 at 25 points because the victim suffered physical injury, i.e., a gunshot wound to the head. See *People v Houston*, 473 Mich 399, 402; 702 NW2d 530 (2005). Because removing 25 points from the OV score changes Lewis's minimum sentence guideline range, MCL 777.61; MCL 777.21(3)(c), we must remand this case to the trial court for resentencing, see *People v Francisco*, 474 Mich 82, 89 n 8; 711 NW2d 44 (2006).

---

considered. *People v Horn*, 279 Mich App 31, 38; 755 NW2d 212 (2008); *People v Watkins*, 247 Mich App 14, 31; 634 NW2d 370 (2001). Moreover, even if we were to consider the affidavit, we would still reject Lewis's ineffective assistance of counsel claim. During arguments in relation to the prosecutor's request for a manslaughter instruction, defense counsel noted on the record that although the prosecutor did not charge Lewis with second-degree murder, the trial court would nonetheless have to give an instruction concerning second-degree murder. Lewis was present in the courtroom when defense counsel made this statement, thereby supporting that he knew that the jury would be provided a second-degree murder instruction. Consequently, Lewis's affidavit is belied by the record.

## B. HABITUAL-OFFENDER ENHANCEMENT NOTICE

Lewis next claims he was improperly sentenced as a habitual offender because the prosecutor failed to comply with the requirements of the habitual offender statute, MCL 769.13. Because Lewis did not raise this issue before the trial court, we review for plain error affecting substantial rights. See *Carines,* 460 Mich at 763.

The plain language of MCL 769.13(2) explicitly requires the prosecutor to file the habitual offender notice with the trial court and serve the notice upon the defendant. While the statute allows the notice to "be personally served upon the defendant or his or her attorney at the arraignment on the information," it also specifically states that "[t]he prosecuting attorney shall file a written proof of service with the clerk of the court." MCL 769.13(2). The purpose of the notice requirement "is to provide the accused with notice, at an early stage in the proceedings, of the potential consequences should the accused be convicted of the underlying offense." *People v Morales*, 240 Mich App 571, 582; 618 NW2d 10 (2000) (citation omitted).

Lewis is correct that the prosecuting attorney failed to file a written proof of service with the clerk of the court as required by MCL 769.13(2). Although we agree with Lewis that this amounted to plain error, we conclude that it did not affect Lewis's substantial rights because the record establishes that Lewis received actual notice of the prosecutor's intent to seek habitual-offender enhancement and that he suffered no prejudice by the lack of a written proof of service being filed in the trial court.[8]

The prosecutor filed the felony information and the felony complaint on January 31, 2017. Both included the fourth-offense habitual offender charge. Lewis has not alleged that he did not receive those documents. See *People v Head*, 323 Mich App 526, 544; 917 NW2d 752 (2018). Lewis was arraigned on the information on March 1, 2017, at which time he waived the reading of the information, which we conclude to mean that Lewis and his counsel received the felony information containing the habitual-offender notice. Transcripts of pretrial proceedings make it patently clear that the habitual-offender notice—which required a mandatory minimum sentence of 25 years' imprisonment if Lewis was convicted of lesser-included offenses, including second-degree murder or manslaughter—was a critical factor in negotiations and trial strategy. More specifically, at a May 4, 2017 pretrial hearing, defense counsel stated that, in addition to being charged with first-degree murder, Lewis was "also charged with a violent habitual fourth which would demand a minimum of 25 years in [prison] if he were convicted of . . . the lesser offenses of either . . . murder in the second[-]degree, or manslaughter." Defense counsel also noted that Lewis was "well aware" of the required mandatory minimum sentences if he were to be convicted of a lesser offense. The mandatory minimum sentence of the habitual-offender notice was also mentioned at a November 9, 2017 pretrial hearing. Thus, the fact that the prosecutor was seeking to enhance Lewis's sentence as a fourth-offense habitual offender

---

[8] We note that Lewis relies on *People v Straughter*, unpublished per curiam opinion of the Court of Appeals, issued April 11, 2017 (Docket No. 328956), which is not binding. See MCR 7.215(C)(1). Additionally, the Supreme Court denied leave to appeal after hearing oral arguments. *People v Straughter*, 504 Mich 930; 930 NW2d 384 (2019).

was acknowledged on the record by defense counsel before trial. See *id.* at 545. At sentencing, neither defense counsel nor Lewis objected to the enhancement. See *id.* Notably, Lewis does not challenge the substantive basis for his fourth-offense habitual offender status on appeal. See *id.*

Thus, the record establishes that Lewis received actual notice of the prosecutor's intent to seek an enhanced sentence and had the opportunity to respond to the habitual offender enhancement. Consequently, Lewis cannot establish that his substantial rights were affected by the prosecutor failing to comply with MCL 769.13(2).

## C. COURT COSTS

Lewis asserts that the trial court imposed an unconstitutional tax when it imposed $1,300 in court costs under MCL 769.1k(1)(b)(*iii*). Challenges to the imposition of fees and court costs under MCL 769.1k that are not based on a defendant's indigency or the applicability of the statute must be made at the trial court level to be preserved. *People v Jackson*, 483 Mich 271, 292 n 18; 769 NW2d 630 (2009). Lewis did not challenge the constitutionality of the trial court's assessment of court costs against him at the trial court level. Consequently, the issue is unpreserved, and we will review the unpreserved claim for plain error affecting substantial rights. *Carines*, 460 Mich at 763.

On appeal, Lewis challenges the imposition of the court costs on various constitutional grounds. However, Lewis acknowledges that, in *People v Cameron*, 319 Mich App 215, 236; 900 NW2d 658 (2017), this Court considered and rejected the arguments that he raises on appeal. While the *Cameron* Court agreed that MCL 769.1k(1)(b)(*iii*) imposes a tax rather than a fee, the Court found that the tax imposed did not violate the "Distinct Statement Clause of Michigan's Constitution," Const 1963, art 4, § 32, or "the separation-of-powers provision of Const 1963, art 3 § 2." *Cameron*, 319 Mich App at 236. Lewis acknowledges that *Cameron* is controlling precedent that binds us but argues that *Cameron* was wrongfully decided. Because we are bound by this Court's decision in *Cameron*, Lewis has failed to establish that the imposition of costs under MCL 769.1k in this case constituted plain error.[9] See MCR 7.215(J)(1).

## VI. MOTION TO REMAND FOR A *GINTHER* HEARING

Lewis alternatively requests a remand for a *Ginther* hearing. This Court denied Lewis's earlier motion to remand,[10] and Lewis has not set forth any additional facts that would require

---

[9] Lewis notes that the Supreme Court granted oral argument to consider whether to grant an application for leave to appeal in *Cameron*. See *People v Cameron*, 501 Mich 986; 907 NW2d 604 (2018). However, the Supreme Court later denied the application for leave to appeal after holding oral arguments. *People v Cameron*, 504 Mich 927 (2019). Therefore, this Court's holding in *Cameron*, 319 Mich App at 236, remains binding precedent.

[10] On February 5, 2019, Lewis's motion to remand for a *Ginther* hearing was denied "without prejudice to a case call panel of this Court determining that remand is necessary once the case is

development of a record to determine if defense counsel was ineffective. Therefore, we again deny Lewis's request for a remand. *People v Williams*, 275 Mich App 194, 200; 737 NW2d 797 (2007), citing MCR 7.211(C)(1)(a).

## VII. LEWIS'S STANDARD FOUR BRIEF

In a pro se supplemental brief filed pursuant to Supreme Court Administrative Order No. 2004-6, Lewis asserts that the trial court abused its discretion by not removing a juror who spoke out at the end of a trial. According to Lewis, the juror made biased comments to the prosecutor, which tainted the entire jury. We disagree.

We review a trial court's decision whether to remove a juror for an abuse of discretion. *People v Mahone*, 294 Mich App 208, 215; 816 NW2d 436 (2011). "A defendant has a right to be tried by a fair and impartial jury." *People v Garay*, 320 Mich App 29, 39; 903 Mich App 883 (2017). The decision whether to remove a juror involves "weighing a defendant's fundamental right to a fair and impartial jury with his right to retain the jury originally chosen to decide his fate." *People v Tate*, 244 Mich App 553, 562; 624 NW2d 524 (2001). Among other reasons, jurors may be removed for bias or prejudice, *People v Mason*, 96 Mich App 47, 50; 292 NW2d 480 (1980), and juror misconduct, see e.g., *United States v Edwards*, 303 F3d 606, 632 (CA 5, 2002).

At the close of trial in this case, Juror No. 2 interrupted the trial court while it was instructing the jury and said "I know at least two of us are in a parking lot where they go home at 4:20." The trial court indicated that the jurors would be excused after the court finished reading the instructions. After the trial court finished reading the jury instructions and selected two jurors to excuse, Juror No. 2 commented: "I'm staying with you because you let people stay in your house." The trial court asked what was said, and Juror No. 2 replied: "I apologize. I apologize, ma'am." When the trial court again asked Juror No. 2 what he said, Juror No. 2 responded "I've been looking at the clock. They take my keys in five minutes, and I don't have a– . . . I said, 'I'll stay with you.' " The trial court then excused the jurors. After the jurors left the courtroom, the prosecutor stated: "Juror no. 2 looked directly at me and said, and pointed at me and said 'I'm staying with you because you let people stay in your house.' In reference to the fact that he believes he's here too late and he doesn't have a ride home." The trial court stated it would address the issue the next morning and would have both previously selected alternate jurors return at that time.

The next morning, the issue of Juror No. 2 was addressed immediately. Upon Juror No. 2 entering the courtroom, the trial court asked about his motor vehicle, to which Juror No. 2 replied: "I apologize for being nervous. Apparently they knew you closed at 4:30. The sign says 4:20 they lock the keys up. I didn't know they would give me some slack." The juror explained his comment about going home with the prosecutor, stating "It was no intention or anything. I was nervous. I didn't know where I was at. I did not mean to be respectful [sic]. I have far too

---

submitted on a session calendar." *People v Lewis*, unpublished order of the Court of Appeals, entered February 5, 2019 (Docket No. 342461).

much respect for the judicial process to intentionally disrespect it. I did speak out of turn." The trial court asked whether the incident would affect the Juror No. 2's ability to be fair and impartial:

> *Q.* All right. Taking that into consideration, can you be fair and impartial? Will that affect your ability to be fair and impartial to both sides?

> *A.* Absolutely. No impact on me whatsoever.

> *Q.* All right, [Juror No. 2]. Thank you so much. You may go back.

After Juror No. 2 left the courtroom, the trial court indicated that it was satisfied that the juror could be "fair and impartial." The trial court then dismissed the two alternates.

We conclude that the trial court's decision to allow Juror No. 2 to remain on the jury did not fall outside the range of reasonable and principled outcomes because, following questioning, the trial court ensured that Juror No. 2 was impartial. Further, there is no evidence before this Court to support that Juror No. 2 was partial to the prosecution. Rather, as explained by Juror No. 2 on the record, his comments were the result of his concerns that he would not be excused in time to retrieve his motor vehicle. Consequently, because the record supports that the challenged comments made by Juror No. 2 did not indicate bias or partiality, the trial court's decision to allow Juror No. 2 to remain on the jury did not constitute an abuse of discretion.

Lewis also argues that Juror No. 2's outburst tainted the entire jury. Because this argument is not preserved, *People v Milstead*, 250 Mich App 391, 402; 648 NW2d 648 (2002), Lewis must show plain error affecting his substantial rights, *Carines*, 460 Mich at 763. Not every instance of juror misconduct requires a new trial. *People v Miller*, 482 Mich 540, 551; 759 NW2d 850 (2008). Rather, a new trial will only be granted for juror misconduct if it is reasonably likely to have affected the impartiality of the jury. *Id*.

As explained above, Juror No. 2's outburst concerned the fact that he had been "looking at the clock" and was worried that he would not be able to retrieve the keys to his motor vehicle. Although Juror No. 2 looked at the prosecutor when saying he would "stay[] with [him]," the juror immediately clarified that the outburst did not concern Lewis or the prosecutor. Although the trial court did not give the jury a specific instruction concerning the incident, the trial court did instruct the jury that its decision must be based only on properly admitted evidence, free of any prejudice or sympathy for or against a party. "It is well established that jurors are presumed to follow their instructions." *Graves*, 458 Mich at 486. Accordingly, Lewis has not shown plain error affecting his substantial rights because it is not reasonably likely that Juror No. 2's outburst affected the impartiality of the jury.

## VIII. CONCLUSION

We affirm Lewis's convictions but vacate his sentences and remand for resentencing pursuant to correctly scored sentencing guidelines. We do not retain jurisdiction.


/s/ Thomas C. Cameron
/s/ Mark J. Cavanagh